Syllabus.

# Richmond.

## James v. Anderson.

November 17, 1927.

Absent, Prentis, P.

1. Rescission, Cancellation and Reformation—*Deeds—Vendor and Purchaser—Suit to Rescind Deed on Ground of Fraud in Procurement—Opening of Abutting Street—Case at Bar.*—The instant case was a suit to rescind a deed on the ground of fraud in the procurement. The value of the lots conveyed depended upon the opening of a street abutting upon them. The question of opening this street was a subject much discussed in the press, at public gatherings and elsewhere, and the public was familiar with it. It was plain that it would be opened sometime, but when no one knew. The purchaser formed a syndicate to take over the lots, which included a member of the city council and later the mayor. After the purchase of the lots the purchaser began to make plans to finance the opening of the street and have it put into operation by the city council as speedily as possible. There was no evidence that, at the time the deed was made, the purchaser knew or could have known what action the council would take about opening the street. The vendor got the full market value for his land as of the time the deed was made, but afterwards the activity of the purchaser and his friends and his skill in devising a financial scheme by which the improvement could be paid for led to the opening of the street, and to the greatly enhanced value of the property.

   *Held:* That these facts did not show fraud in the procurement of the deed.

2. Vendor and Purchaser—*Fraud—Duty of Purchaser to Disclose Facts Showing the Probable Enhancement of Value of the Property to Seller.*— A prospective purchaser who occupies no confidential relation to the vendor is under no obligation to disclose his knowledge that a public improvement is to be made in the near future which will greatly enhance the value of the property which is the subject of the sale. A request for an option does not create such a confidential relation. There is no fraud in a prospective purchaser failing to make such disclosure.

3. Illegal Contracts—*Public Policy—Contract with Member of Council.*— In the instant case, a suit to rescind a deed, the purchaser had no

right to make a contract with members of the city council to put through a street which would greatly enhance the value of the property which was the subject of the sale. That would be contrary to public policy, but the evidence in the instant case did not support any such theory. The real ground of the seller's complaint was the action of the council on dates subsequent to the sale and execution and delivery of the deed. These could not affect the validity of the deed.

4. RESCISSION, CANCELLATION AND REFORMATION—*Deeds—Vendor and Purchaser—Intermediary in Sale Acting as Both Agent for Seller and Buyer—Case at Bar.*—In the instant case, a suit to rescind a deed on the ground of fraud in procurement, the purchaser employed one S. to obtain an option on the property from the vendor. This S. was unable to do. Afterwards when he was no longer the agent of the buyer, the vendor employed S. to sell the property in question. Knowing that the purchaser had applied for an option, S. went to him and told him of his employment as agent to sell, and of the price and terms upon which he was authorized to sell. Thereupon the purchaser bought the property.

*Held:* That S. was not the agent of both the seller and buyer and that the deed was not voidable on this account.

5. VENDOR AND PURCHASER—*Agency—Agent of Both Seller and Buyer.*—A man cannot be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity, and ability is the main consideration in the selection of an agent, and so careful is the law regarding this fiduciary relation that it will not allow an agent to act for himself and his principal, nor to act for two principals on the opposite sides of the same transaction. All such transactions are voidable, and may be repudiated by the principal, without showing that he was injured.

Appeal from a decree of the Circuit Court of Washington county. Decree for defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*J. S. Ashworth,* for the appellant.

*Peters, Lavinder & Peters; White, Penn & Stuart;* and *Morison, Morison & Robertson,* for the appellees.

BURKS, J., delivered the opinion of the court.

This suit was brought by the appellant to rescind a deed made by himself and wife on May 23, 1925, whereby he conveyed to A. E. Anderson, trustee, a strip of land bordering 141 feet on Beaver creek, Bristol, Virginia. There was an original bill and two amended bills. The ground for relief set up by the original bill was fraud in the procurement of the deed. In the amended bills there was added the charge that H. W. Sparger, the intermediary in the transaction, acted in a dual capacity, representing both the grantor and the grantee in the deed. Evidence was taken on each side, and, at the hearing, the trial court entered a decree dismissing the suit at the complainant's cost. From that decree this appeal was taken.

Beaver creek was one of the principal sewers in that part of the city, ran practically parallel with James street and Moore street, and was about equi-distant from each. A rough sketch hereto annexed shows the location of the property in controversy and of adjacent property. Lots A and B are the lots conveyed by James to Anderson, trustee.

Traffic in this part of the city was much congested, and it was apparent that at some time Beaver creek would be covered over and a street superimposed on it. It was a subject much discussed in the press, at public gatherings and elsewhere, and the public was familiar with it. It was plain that the improvement was coming, but just when no one knew, as the city was in no condition to finance it. It was equally plain that, when made, the lots abutting on the new street would be greatly enhanced in value. At present they were mere back lots; then they would have street frontage. Such was the situation when the deed was made.

Opinion.

JAMES STREET

| C. D. Allen House | Old James House 75' | J. K. James 75' |
|---|---|---|
|  | B | A 141' |

Beaver Creek

Moore Street

Cumberland Street

100'

A. E. Anderson was vice-president of the Dominion National Bank of Bristol and H. M. Bellamy and H. W. Sparger were employed in the same bank. Occasionally, Anderson and one or the other of these employees had obtained options on real estate in Bristol, and had sold them at a profit, and whenever they did so they divided the profit on "a fifty-fifty basis." In 1925 there had been several sales of land fronting on Beaver creek, and Anderson conceived the idea that purchases on that creek would be a good investment. He sent Bellamy to James to get a price on his creek frontage, and suggested to him that he offer him $5,000 for it. Bellamy came back and told Anderson that James said he would not take less than twice that much for it. Shortly thereafter, knowing that Sparger and James were friends, he sent Sparger to James to get an option on his creek front, but Sparger returned and stated to Anderson that James would not give an option on the property fronting on the creek but would sell his home place for $8,000. This had a creek frontage of about seventy-five feet. Anderson declined to purchase the home place. He testified that:

"After thinking about it, I told Mr. Sparger that I figured it would not be worth our while to try to sell that property, and I thought that the matter had been dropped, or felt like it had, because Mr. Bellamy had been up there and had not succeeded in getting an option on the property, and Mr. Sparger had not either, but in a few days Mr. Sparger came to me and said that he had been to Mr. James and Mr. James had agreed to take $8,500 for all of his property fronting on Beaver creek, and stated that he would pay him $500 commissions for selling the property, and that he wanted it all in cash. I then decided in my own mind

that I would like to own a part of that property, or make a little investment myself, and conceived in my own mind the idea of organizing a syndicate for the purchase of this property."

Anderson then proceeded to get up his syndicate to make the purchase. Included in the list was a member of the city council and the city attorney. Anderson testified that "after the subscription blank was practically completed to a point that I knew the money would be available, I first wrote out an offer to Mr. James and signed it 'trustee,' and I also filled out a form for his signature and the signature of Mrs. James, accepting this offer, and took it up to Mr. Stant's office, and asked that he go over the form and see if it was properly prepared. After reading it, he decided not to make the changes on my paper, but prepared one himself. This was given to Mr. Sparger and he returned it to me signed a number of days later." In a day or two James brought the deed, duly executed, and tendered it to Anderson and demanded his money. Anderson explained to him that he was buying for himself and others, and that the title would have to be examined. This led to a colloquy between them, in which James demanded a return of his contract, but it was not returned and Anderson testified that "in just a day or two the deed was prepared, and Mr. Stant and Mr. James came to the bank with it, and I paid Mr. James, giving him two checks, one for $8,000 and the other for $500. Both of these checks were made payable to Mr. James. Then I returned the deed, I think, to Mr. Stant, and asked him to see if it was in proper form, and if so to have it recorded, which was done, and the deed was returned to me, or I went after it, I don't know which. At that time I thought Mr. James was satisfied with his trade. He

appeared to be.    He came into the bank several times and on one trip brought me the insurance policy on the old frame building which is on this property, which building rented for $10.00 a month.''

James paid Sparger the $500 commissions, and Sparger gave $100 of it to Anderson, and he gave $25 to Bellamy.    The transaction was closed by delivery of the deed and the payment of the purchase money May 23, 1925, and deed was recorded at 10:20 A. M., May 25, 1925.

Anderson immediately began to make plans to finance the improvement, and to have it put into operation by the city council as speedily as possible. The cost was estimated by Anderson at $75,000, and the value of the lots after the improvement was made was put at $300 per front foot.    At that time the lots had no frontage value, but were only taken into consideration in estimating the value of the front part of the lots.    This valuation was small and could not be changed for five years, except by consent.    He procured the consent of the owners of lots abutting on the creek to fix a frontage value of $150 per foot, and that this change might be made at once if the city council would proceed promptly with the improvement.    The city also owned a frontage of 330 feet on the creek, which were mere unimproved back lots, but which he estimated would be worth $300 per front foot, if the improvement was made.    He also got other citizens interested in having the improvement made at once, and when the council met on June 2, 1925, this scheme of improvement was laid before it, and was discussed by members of the council and citizens, and by counsel representing a number of citizens, and the following entry was made on the minutes of the council:

"Mr. H. G. Lavinder, representing a number of

citizens, requested the council to build a street over Beaver creek from State street to Cumberland street, and suggested that the improvement could be financed by the sale of certain property owned by the city which would face the proposed street and which at the present time is of but little value but would become valuable if said street was constructed over the creek. The matter was discussed by members of the council and citizens and it was finally moved by Mr. Goodwyn that the council go on record as being in favor of the immediate improvement suggested in the foregoing, and that the city manager prepare an estimate of the cost and submit a report and recommendation at a called meeting or at the next regular meeting of the council, which motion carried by the following vote:

"Ayes: Goodwyn, Grant and Robertson."

At this time Anderson and Goodwyn each owned a fifth interest in the syndicate holding. The council was composed of five members, but only three of them were present, of whom Goodwyn was one. The action of the council was by no means final, but was a mere preliminary step towards making the improvement. The next meeting of the council was held June 10, 1925, but in the meantime Anderson had sold one-half of his interest in the syndicate holding to George M. Warren, mayor of the city and a member of the council. At this meeting all five members of the council were present, and Goodwyn and Warren, without disclosing their interest, concurred with the other members of the council in the adoption of the following resolution:

"Mr. Goodwyn introduced the following:

"Resolved, that the council of the city of Bristol, Virginia, approves the covering of Beaver creek from State street provided acceptable bids can be obtained on the construction of same, and accordingly the city

attorney and city manager are instructed to proceed at once to ask for bids, after proper advertisement, for the construction of the work according to the plan submitted at this meeting by the city manager. And the said city manager and city attorney are further instructed to ask for bids on any different plans for said construction than that offered by the city manager.

"Upon the further motion of Mr. Goodwyn and by the following vote, the foregoing resolution was adopted:

"Ayes: Grant, Goodwyn, Malone, Robertson and Warren.

"It was moved by Mr. Goodwyn that the city manager and city attorney proceed, at once, to secure the necessary rights of way on the east side of Beaver creek, of sufficient width to carry the necessary walls in connection with the covering of the creek, which motion carried."

At a number of subsequent meetings of the council, when all five members were present, the improvement was approved and its execution directed by a unanimous vote of the council.

Both Goodwyn and Warren testified that the improvement was a great public necessity, and that their votes were not influenced by their interests, and that after the method of financing the improvement had been developed it was greatly to the interest of the city to have it made.

Goodwyn and Warren are critized for not disclosing their interest before voting. They ought to have done so, and thus have freed themselves from the suspicion of seeking to further their own interests. The city, however, is not here complaining, and the evidence justifies the conclusion that the improvement is one greatly to the advantage of the city and should have

been made, regardless of the special benefit to the owners of lots adjoining the creek. Furthermore, the unanimous vote of all the members of the council on the measure necessary to effect the improvement indicates that the public suffered no harm from the failure to make the proper disclosures. The precedent, however, is a hazardous one, and not to be commended.

[1-3] There is no evidence that, at the time the deed was made, Anderson knew or could have known what action the council would take about covering the creek in the near future. In fact, nobody knew, not even the members of the council itself. But even if Anderson had known that the improvement was to be made in the near future, he occupied no confidential relation to James and was under no obligation to disclose it. The request for an option did not create such a relation. If A knows that a railroad is shortly to be built in an undeveloped coal region, he may go into that region and buy all the coal he wants without disclosing to the owner his knowledge about the projected railroad. This is no fraud. Of course, Anderson had no right to make a contract with the members of the council that was contrary to public policy, but the evidence does not support any such theory. The real ground of James' complaint is the action of the council on June 21, 1925, and on subsequent dates, but this was after the sale to Anderson, trustee, was consummated, and the deed to him had been executed and delivered, and could not have affected the validity of his deed. Under the circumstances as they existed when the deed was made, James got the full market value of his land, but the skill of Anderson in devising a financial scheme by which the improvement could be paid for in the near future, and the activity of himself and his friends and of others interested in the

development led to the action of the council on June 2, 1925, and subsequent dates, and this immediately led to the greatly enhanced value of the property in controversy. The action of the council coming so soon after the purchase by Anderson led to the suspicion of fraud, and the suspicion to the charge. How the action of the council was brought about is fully and satisfactorily shown by the evidence, which fails to show that the action of the council was a part of a scheme by Anderson to defraud James. The case sought to be made by the original bill fails for lack of evidence to support it.

The amended bills, however, charge a dual agency on the part of Sparger, who was employed by James to make the sale; that while he was the agent of James to make the sale, he also acted as the agent of Anderson to make the purchase.

The evidence is full, complete and uncontradicted that Sparger's only employment by Anderson was to obtain an option on the creek front of James. This is stated time and again by both Sparger and Anderson in their testimony. Anderson had previously sent Bellamy to James on the same mission, and had suggested an offer of $5,000, but of this Sparger was not informed, nor did he know of Bellamy's visit to James until he went to see James. He found James indisposed to sell the creek property, and he declined to give an option on it, but offered to sell the "home place," which had a frontage of seventy-five feet on the creek, for $8,000. These facts were reported to Anderson who said that he was not interested in the "home place," and gave the matter no further consideration. He regarded it as "dropped," and it passed out of his mind. Sparger, however, made several additional visits to James, and endeavored to persuade him that

it would be better for him to sell the creek property than his home place, though not to any particular person nor at any particular price. This matter was discussed by them in its various phases, though the price was not mentioned, and finally James concluded to make the sale, fixed his own price and terms, without suggestion from Sparger, and employed him to make the sale for cash at the price of $8,500, of which sum $500 was to be paid to Sparger as commission for making the sale. Prior to this employment, Sparger occupied no contract relations with James. He had at first endeavored to get an option for Anderson, but this had been refused. Thereafter his visits and advice were directed to what property he should sell, whether the "home place" or the creek front, not to whom he should sell nor at what price. James owed a considerable sum of money and wished to sell some of his property to give him at least partial relief.

Anderson was not in a financial condition to buy the property, and had not considered buying it. He had previously dealt in options, sometimes in connection with Bellamy or Sparger, which he had sold at a profit, and what he was seeking in the instant case was an option on the property. If he could obtain it and sell it at a profit, it was understood that the profit be divided between him and Sparger, but no option could be obtained, and he regarded the proposed transaction at an end. After the refusal of the option, Sparger had no further authority from Anderson. His agency was terminated.

Such was the situation at the time James employed Sparger to make the sale. He was no longer the agent of Anderson, but, knowing that Anderson had applied for an option on the property, he went to him and told him of his employment as agent to sell, and of the

price and terms upon which he was authorized to sell. Anderson, after obtaining the advice and assistance of friends, determined to buy, although some of them thought the price was high, and addressed to James the following offer, with the form of an acceptance written thereunder:

"Bristol, Virginia,
"May 12, 1925.

"Mr. J. King James,
"Bristol, Virginia.
"Dear Sir:

"I hereby offer you the sum of $8,500.00 in cash for 145 feet of your land which fronts on Beaver creek, beginning with Cumberland street, Bristol, Virginia, running back between parallel lines, the dimensions to be 145x100 feet off the rear of your said property.

"Yours very truly,
"A. E. Anderson,
"Trustee.

"Mr. A. E. Anderson, Trustee:

"I accept the above offer, and will at once proceed with preparation of deed, which will be presented to you when prepared and executed by Mrs. James and myself.

"Mrs. Julia K. James, my wife, signs this as agreement to join with me in the deed referred to.
"May 18, 1925.
"Wit.
"H. W. Sparger."

This he handed to Sparger, who returned it to him a few days thereafter, with the names of James and his wife signed to the acceptance, and shortly thereafter the deed in controversy was executed and delivered to Anderson.

It is true that Sparger does say that in asking for the

option he represented Anderson only, but this is sufficiently explained by him when he testifies that he meant that he did not represent any of Anderson's co-purchasers. He thought that the question put to him was to elicit the information whether he represented all the purchasers, or Anderson only, and, so understanding, he answered Anderson only. In fact, he did not know who the other purchasers were.

In applying for the option Sparger, it is conceded, was acting for Anderson, as he received from him and transmitted to James the offer to purchase, and it is with reference to these things that Sparger testified that he represented Anderson on his first visit to James to obtain the option, also in closing the deal and all the time. His cross-examination was protracted to great length, but it fails to disclose that he represented Anderson in any manner except as stated above. Nor does the evidence show that anything he said or did after his employment was inconsistent with the duty he owed to James. He stated to Anderson the terms of sale, he accepted from Anderson an offer to purchase and carried it to James and brought back to Anderson the acceptance of the offer signed by James and his wife. This was not inconsistent with any duty he owed to James.

The evidence fails to show that Sparger had any inside information about the improvement of the property which he did not communicate to James. He knew nothing more than James did about when the property would be improved. He did not know that Goodwyn or the city attorney had any interest in the purchase, nor did he know who were Anderson's associates in the purchase. He made no suggestion as to the price to be put on the property by James, nor did he suggest any diminution in the price named by

James. He testified that he acted only in the interest of James and got the best price for the property he could. At all events he got the price fixed by James, and it was a good price for the property under the existing circumstances.

[4] The most disadvantageous light in which the action of Sparger could be viewed is that he induced James to offer for sale his creek front instead of his "home place," and thereby afforded Anderson an opportunity to purchase. But he neither fixed nor suggested a price, and the evidence shows that he acted in good faith in his advice and really believed it was to the best interest of James to sell the creek property. The agency to sell was faithfully executed according to its terms, and stood on no higher ground than an offer to sell to anyone who would comply with the terms stated, but was revocable at the pleasure of the owner at any time before acceptance. It differed from what Anderson sought in the first instance only in not fixing time within which the option must be exercised. Sparger presented James' offer to Anderson and he accepted it in the manner and with the result hereinbefore stated. This was not a breach of faith on the part of either Sparger or Anderson.

[5] We do not at all recede from the position taken in *Ferguson* v. *Gooch*, 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234, but reaffirm the statement that "nothing is better settled than that a man cannot be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity and ability, is the main consideration in the selection of an agent, and so careful is the law regarding this fiduciary relation that it will not allow an agent

to act for himself and his principal, nor to act for two principals on the opposite sides of the same transaction. All such transactions are voidable, and may be repudiated by the principal, without showing that he was injured.''

The facts of the instant case, however, do not justify the application of the doctrine there announced. They are more nearly assimilated to the facts in *Croghan* v. *Worthington Hardware Co.*, 115 Va. 497, 79 S. E. 1039. The facts there were these: Mrs. Croghan owned a house and lot in Staunton which she put in the hands of Tannehill and McCray, real estate brokers, at the price of $2,000. She did not live in Staunton. Shortly after the property was put in the hands of Tannehill & McCray they wrote to her that they had an offer of $1,200 for the property which she refused to take, and some time thereafter they again wrote to her stating that the person who had offered $1,200 had increased his offer to $1,500 cash, and in this letter they stated that the property was in bad condition, and full of very bad tenants, and that in their opinion the house would never be desirable for a residence, and considerable money would have to be spent on it to make it a warehouse. The proposed purchaser lived in Staunton. In reply to this letter Mrs. Croghan wrote, ''I accept the offer you made me for $1,500 cash,'' and the transaction was closed. Thereafter she visited Staunton, and she says that she found the property was in good condition, and was worth a good deal more than she had been offered for it, and at public auction it would bring from $2,200 to $2,300, and thereupon she declined to perform the contract. The purchaser then sued her for specific performance. Both Tannehill, one of the agents, and Worthington, the negotiating agent of the purchaser, stated in their depositions that the

real estate brokers were agents of the hardware company in the transaction.    Mrs. Groghan sought to have the contract declared void because the real estate brokers had acted as agents for both the vendor and the purchaser.    In commenting upon this, Judge Keith, speaking for the court, said:

"Looking to all the facts of the case, we are of opinion that there is no merit in the defense based upon the proposition that Tannehill and McCray were agents for both the buyer and the seller.    It is true that in their depositions both Tannehill, one of the agents, and Worthington stated that the real estate firm were the agents of the hardware company, if we look merely to an isolated question and answer; but when their depositions are considered as an entirety, and we perceive just what idea the witnesses meant to convey, it is plain that they mean to say that the firm of Tannehill & McCray, who had been employed by appellant to make sale of the property, and with whom she had listed it for sale, were also the agents of the Worthington Hardware Company *to this extent, and to this extent only, that they were to transmit the offer of the purchaser* for acceptance or rejection of Mrs. Croghan.    In this there was no impropriety."    (Italics supplied.)

We are unable to say from the record that Sparger acted as the agent of the purchaser in bringing about the sale in controversy, or in antagonism to the interest of James.    At the outset he simply applied for an option which was refused.    At the conclusion he was simply the intermediary for the transmission of an offer and an acceptance between two principals. In the interim, his advice and efforts were directed to a sale of the creek front instead of the "home place," without suggestion as to terms or purchaser.    He

never asked for or suggested any agency to sell, but when appointed he obtained for James the price he had fixed of his own accord, and earned the compensation promised.  He withheld no information within his knowledge.  In these matters he was not disloyal to the trust reposed in him by James.

The decree of the circuit court will be affirmed.

*Affirmed.*