**BUSH DEVELOPMENT
CORPORATION,
Plaintiff,**

v.

**HARBOUR PLACE ASSOCIATES, et al., Defendants.**

**Civ. A. No. 85–859–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

April 14, 1986.

Mario Greszes and John P. Hume,
Krooth & Altman, Washington, D.C., for
plaintiff.

Gregory A. Giordano, Clark & Stant, Virginia Beach, Va., Jon W. Wickwire, Daniel E. Toomey and Jeffrey G. Gilmore, Wickwire, Gavin & Gibbs, Vienna, Va., Winthrop A. Short, Jr., and Stephen E. Noona, Kaufman & Canoles, Ronald M. Gates and Kenneth A. Norman, Boyd, Payne, Gates & Farthing, Robert R. MacMillan, Breeden, MacMillan & Green, John Franklin, III, Taylor, Walker & Adams, Norfolk, Va., for defendants.

## ORDER

CLARKE, District Judge.

Plaintiff, Bush Development Corporation ("Bush"), brought this action alleging breach of contract, common law fraud, and fraud under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–1968, in connection with Bush's role as general contractor for Harbour Place, a condominium project in Norfolk, Virginia. The seven defendants are Harbour Place Corporation, Harbour Place Associates (the partnership that is the developer and owner of Harbour Place) and five individuals who are partners in Harbour Place Associates.

A number of motions have been filed by the parties and are now ready for decision. Plaintiff has moved the Court to enlarge the temporary restraining order issued December 30, 1985 into a preliminary injunction. Plaintiff also seeks a protective Order relating to material purported to encompass privileged communications and work product, and a motion to enforce compliance with a subpoena served on a nonparty. Defendants have filed a motion to dissolve the temporary restraining order, along with a number of dispositive motions, including a motion to dismiss the RICO count under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, and a motion for summary judgment directed primarily at the fraud claims in Counts I and II of plaintiff's complaint. Defendants have also asked the Court to impose sanctions against the plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure.

## I. PRELIMINARY INJUNCTION

On December 30, 1985, the parties appeared before the Honorable John A. MacKenzie of this Court on plaintiff's motion for a temporary restraining order forbidding nominal defendant Sovran Bank, N.A. from honoring a draw on a letter of credit involved in the dispute between the parties. After hearing the arguments of counsel, Judge MacKenzie issued a temporary restraining order that day. This temporary restraining order is still in effect, having been extended by agreement of the parties and most recently by this Court's Order of March 7, 1986 in accordance with Rule 65(b) of the Federal Rules of Civil Procedure. *See* Transcript of March 7, 1986 hearing on motions at 112–13. The amount of the requested draw is $1,125,-632.14.

As was stated in the December 30, 1985 Order, the issuance of preliminary injunctions in this Circuit is governed by a "balance of hardship" test:

> Under the balance of hardship test the district court must consider, in "flexible interplay," the following four factors in determining whether to issue a preliminary injunction: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success.

*Merrill Lynch, Pierce, Fenner & Smith v. Bradley,* 756 F.2d 1048, 1054 (4th Cir.1985), citing *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 193–96 (4th Cir.1977).

The Court concluded after the December 30, 1985 hearing that Bush would suffer

irreparable harm if an injunction did not issue (for reasons set forth in the Court's December 30, 1985 Order). The Court now turns to evidence on the harm issue not before the Court on December 30. In support of their motion to dissolve the temporary restraining order, the defendants now allege that Bush would not suffer irreparable harm if an injunction did not issue because 1) Bush owns real estate valued at between ten and thirteen million dollars, with a net worth of between five and eight million dollars, 2) Bush has a positive cash flow from operations of $700,000 a year, and 3) it would only cost Bush $120,000 a year to service the debt associated with the disputed draw on the letter of credit.

After considering these allegations, the Court nonetheless finds that Judge MacKenzie's conclusion that the plaintiff would suffer irreparable harm if the Court declines to issue an injunction still holds true. To begin with, the "market value" figures quoted by defendant in relation to Bush's real estate holdings do not reflect the time that would be required to sell the projects, tax aspects of such a transaction, costs of fix-up and sale, etc. Bush's executive vice-president has stated that an immediate or "fire sale" liquidation of these properties would involve numerous difficulties and would likely result in the loss of any net worth built up in these properties (Pars. 18–25 of March 4, 1986 affidavit of Marc B. Sharp). Second, according to Sharp, the alleged $700,000 cash flow from operations is deceptive, and translates into a deficit of over $250,000 a year once "restrictive, contractual or mortgage claims thereon" are considered (id. at Par. 26). Also, Bush's net working capital (current assets less current liabilities) is only $772 (id. at Par. 15). Finally, the suggestion that it would only cost Bush $120,000 to service the debt associated with the letter of credit ignores the fact that the letter of credit would become a demand note in Sovran's hands once drawn upon.

Although defendants at the December 30, 1985 hearing conceded that they would not suffer irreparable harm from the issuance of an injunction, (Tr. 32–33), they now contend otherwise. Defendant Douglas E. Kahle states that the Harbour Place Associates partnership is in the midst of an "extreme financial crisis." Nevertheless, these contrary assertions of the defendants do not equal plaintiff's expression of the harm it would suffer. Thus, the Court concludes that the balance of hardship tips decidedly in plaintiff's favor. Merrill, 756 F.2d at 1055; Blackwelder, 550 F.2d at 193 ("considerable weight is given to the protection to the plaintiff as contrasted with the probable injury to the defendant").

Having concluded that the balance of harm favors the plaintiff, the Court now turns briefly to the remaining two factors. The likelihood of plaintiff's success on the merits, as reflected by the Court's handling of the motions to dismiss and for summary judgment, is unclear at this point. The final factor, the public interest, also adds little to the analysis. Defendants argue that the Court should be guided by the policy of upholding the security and value of letters of credit, See KMW International v. Chase Manhatten Bank, 606 F.2d 10, 16 (2d Cir.1979). However, § 8.5–114(2)(b) of the Code of Virginia empowers courts to enjoin a bank from honoring a draw on a letter of credit where "there is fraud in the transaction." While the mere allegation of fraud may not be enough to support an injunction, Printing Dept., Inc. v. Xerox Corp., 20 B.R. 677 (E.D.Va.1981), plaintiff's affidavits together with the facts surrounding the admitted conflicts of interest, certainly rise above this standard. It also bears noting that the history of docket movement in this Court assures that this matter will be brought to trial promptly. The case is scheduled to be tried July 28, 1986, less than four months from this date. This short period of time weighs in favor of granting an injunction.

Accordingly, plaintiff's motion to enlarge the temporary restraining order into a preliminary injunction is GRANTED, and Sovran Bank is ENJOINED from honoring a draw on the subject letter of credit (No. S.3418 or succeeding letters of credit). The $75,000 bond provided by the plaintiff at

the direction of the Court shall be maintained.

## II. PROTECTIVE ORDER

During the course of discovery, plaintiff inadvertently turned over to the defendants a copy of an annotated draft complaint. Plaintiff now seeks a Protective Order, pursuant to F.R.Civ.P. 26(c), prohibiting the admittance of the draft complaint into the deposition record as well as any other use defendants might envision for this document.

The document at the center of this controversy is a 23 page draft complaint prepared by plaintiff's counsel, allegedly containing the handwritten notes of Marc B. Sharp, Bush's executive vice-president. Some of these handwritten notes concern the likelihood of the complaint succeeding in federal court, and the consequences should it not succeed. According to Sharp, these notes were made during the course of a conversation with counsel during which counsel provided Sharp with counsel's opinion on these matters.

Plaintiff argues for the issuance of a Protective Order on three grounds:

(1) the attorney work product doctrine;

(2) attorney-client privilege; and

(3) the irrelevancy of the document and notes to anything at issue in the case.

Defendants oppose these arguments and also contend that plaintiff waived any privilege as a result of misconduct on its part.

 There can be little question that the annotations on the document reflecting counsel's opinion as to the success of the suit are protectable. Rule 26(b)(3) of the Federal Rules of Civil Procedure provides in part that "the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney." In applying Rule 26(b)(3), courts have distinguished between the normal work product of an attorney and opinion work product, with opinion work product given nearly "absolute immunity" from discovery. *In re Murphy*, 560 F.2d 326, 336 (8th Cir.1977). Counsel's statements concerning the claim's likely success, even when transcribed by the client, are prime examples of the types of materials entitled to near absolute protection under Rule 26(b)(3).

The Court believes that in other respects, the draft complaint, including various other comments made in the margin by Sharp, is entitled to a protective order. The document was certainly prepared in anticipation of litigation and is thus entitled to at least the qualified immunity of Rule 26(b)(3) of the Federal Rules of Civil Procedure. A party seeking a document protected by qualified immunity must show a "substantial need" for the materials and an inability without due hardship to obtain equivalent materials. F.R.Civ.P. 26(b)(3). Counsel for the defendants have made no attempt to show their need for the annotated draft complaint (other than in relation to the notations on the likely success of the claim which this Court has held are entitled to a protective order).

Finally, the Court wholly rejects defendants' argument that plaintiff waived any privilege by engaging in alleged misconduct, namely, the bringing of a baseless complaint. As the court's denial of defendants' dispositive motions indicates, this argument is simply without merit. Accordingly, this Court ORDERS that the document in question be protected from further discovery in relation to this litigation.

The Court notes that this ruling is consistent with its view that it would be grossly unfair for one side of the case to gain a substantial advantage over the other side because of an inadvertent error of counsel. Cases are to be tried and decided on merit, not on luck.

The Court further ORDERS that the draft complaint in question and any memorandum or notes pertaining or referring thereto and all copies thereof in the possession of the defendants, their counsel, their insurers', if any, their agents or anyone else having possession thereof by virtue of the document having been inadvertently furnished in response to discovery be returned forthwith to plaintiff's counsel.

## III. MOTION TO ENFORCE COMPLIANCE WITH SUBPOENA

Plaintiff has filed a motion to enforce compliance with a subpoena *duces tecum* served on a non-party, Home Federal Bank. The subpoena calls for the production of financial documents including:

> 1) documents showing the assets, liabilities and monthly bank accounts of the individual partners of Harbour Place Associates;
>
> 2) settlement sheets for units sold at Harbour Place; and
>
> 3) documents showing Unit purchasers' assets, liabilities and bank accounts where the purchase was related to or associated with the defendants.

■ Home Federal had produced all the requested documents, but counsel for the defendants' objected to their disclosure on grounds of confidentiality. Since the documents involved are the business records of Home Federal Bank, the defendants have no standing to challenge the subpoena issued to the bank. *Clayton Brokerage Co., Inc. v. Clement*, 87 F.R.D. 569, 571 (D.Md.1980); *Shepherd v. Castle*, 20 F.R.D. 184, 188 (W.D.Mo.1957). Home Federal, however, has asked the Court to review these potentially confidential financial records and to issue an appropriate protective order.

■ A subpoena *duces tecum* in aid of a deposition should be enforced unless it is clear "that the evidence sought can have no possible bearing on the issues." *Dart Industries, Inc. v. Liquid Nitrogen Processing Corp.*, 50 F.R.D. 286, 292 (D.Del.1970). Here, plaintiff argues that these documents are relevant on issues of motive, intent, profits received, and damages. Defendants have not presented the Court with any opposing arguments. The Court cannot conclude that the documents would have no bearing on these relevant issues. *Id.* Accordingly, the production of the documents by the deponent Home Federal Bank is approved.

Plaintiff's counsel shall not disclose the contents to any other person or entity other than the agents of his client and the infor-mation contained shall be used solely for purposes of this law suit and the disclosure, if any, of the documents or any part thereof by plaintiff's counsel and his agents and employees or by the agents or employees of the plaintiff corporation for any other purpose is expressly forbidden.

If it becomes necessary for the documents to be filed with the Clerk, they shall be placed under seal and shall be available only to the Court and counsel for the parties to this action. It shall be the responsibility of counsel for the parties to call to the attention of the Clerk this provision of this Order if the documents are filed or lodged with the Clerk.

## IV. RICO

■ The Court now turns to defendants' motion to dismiss Count I of plaintiff's complaint. In Count I, plaintiff claims that the defendants' actions violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. Defendants move to dismiss the RICO Count under F.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted on the ground that the alleged acts of mail fraud do not constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5) where there is only one scheme to defraud. Count I of plaintiff's complaint alleges six separate but related acts of wire and mail fraud committed by the participants in the alleged RICO enterprise.

According to 18 U.S.C. § 1961(5), a pattern of racketeering *"requires* at least two acts of racketeering activity." 18 U.S.C. § 1961(5) (emphasis added). The Supreme Court has stated that the implication of Congress' use of the term "requires" in the definition is that "while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co.*, —— U.S. ——, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Relying on his language in *Sedima,* some lower courts have restricted the otherwise breathtaking scope of civil RICO by dismissing RICO complaints that involve only one criminal scheme, *e.g., Allington v. Carpenter*, 619 F.Supp. 474, 478 (C.D.Cal.

1985), or merely repeated acts carrying out the same activity. *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 831 (N.D.Ill.1985).

The Court is unwilling, however, to restrict the scope of civil RICO in the manner suggested. In *Battlefield Builders, Inc., v. Swango*, 743 F.2d 1060 (4th Cir.1984), the United States Court of Appeals for the Fourth Circuit faced a similar question involving the definition of a pattern of racketeering. In *Swango*, the plaintiff was a condominium developer who sued the owners of a condominium in his complex for a violation of RICO. The predicate offenses upon which he based his RICO claim were extortion and attempted extortion. Although the district court ruled that the complaint stated allegations of "garden-variety commercial breach of contract, perhaps fraud, even perhaps conspiracy," *id.* at 1062, it did not feel that the allegations amounted to a pattern of racketeering under RICO.

The Fourth Circuit reversed, holding that:

> [P]laintiff alleged extortion under Virginia law and a second series of acts constituting attempted extortion under Virginia law so that plaintiff did allege a cause of action which is immune to a Rule 12 motion to dismiss ...
>
> \* \* \* \* \* \*
>
> As we have shown, the Act authorized a civil suit for treble damages and other recovery against any person who has engaged in a pattern of racketeering activity and that, for purposes of this case, *a pattern of racketeering activity is established if defendants are alleged to be guilty of both extortion and attempted extortion.*

*Id.* at 1063 (emphasis added).

As in the case at hand, the racketeering activity alleged in *Swango* involved only one victim and could be considered one extended scheme or criminal episode. Nevertheless, the Court of Appeals held two such related acts to be sufficient to form a RICO pattern.

This Court is not persuaded that the Fourth Circuit's holding in *Swango* is dis-turbed by language in the Supreme Court's *Sedima* opinion discussing the definition of "pattern of racketeering" under § 1961(5). In commenting on the scope of the pattern of racketeering requirement, the Supreme Court stated:

> The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.*, at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770, 789 [95 S.Ct. 1284, 1295–96, 43 L.Ed.2d 616] (1975).

105 S.Ct. at 3285 n. 14.

The Supreme Court did not address the issue of whether the racketeering acts alleged in *Sedima*, consisting of mail and wire fraud allegations in a dispute between parties to a joint venture, could constitute a pattern under 18 U.S.C. § 1961(5). *Id.*, 105

S.Ct. at 3287. Nevertheless, it is clear from the quoted language that the Supreme Court's concern is directed towards instances where sporadic or isolated acts are alleged to form a pattern of racketeering activity, rather than to instances where the racketeering acts are so closely related that they can be said to be a part of a single criminal episode. *See R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir.1985). In *R.A.G.S.* the alleged pattern of racketeering consisted of two related acts of mail fraud. Judge Wisdom, writing for the Fifth Circuit panel, rejected the *Sedima*-based argument that while two racketeering acts are necessary they may not be sufficient, and held that two related acts of mail fraud could constitute a pattern of racketeering activity. *Id.*

In addition to turning the Supreme Court's reasoning on its head, defendant's argument is out of line with the tenor of the remainder of the *Sedima* opinion. As the Court stated:

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, *see United States v. Turkette,* 452 U.S. 576, 586–587 [101 S.Ct. 2524, 2530–531, 69 L.Ed.2d 246] (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91–452, § 904(a), 84 Stat. 947. The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity.

*Id.*, 105 S.Ct. at 3286.

In short, the narrow reading of the pattern of racketeering requirement proposed by the defendants is, in principle, very similar to the criminal conviction and racketeering injury requirements that were rejected by the Court in *Sedima.* The source of these strained interpretations is the "extraordinary, if not outrageous uses to which civil RICO has been put," including its use in "everyday fraud cases." *Id.* at 3287. Nevertheless, the Supreme Court recognized that RICO's expansiveness reflects the statute's breadth, not its ambiguity, and concluded that the statute's use against respected and legitimate enterpris-

es was a direct result of the statute's language that could only be corrected by Congress. *Id.* at 3287.

Accordingly, defendants' motion to dismiss the RICO count under F.R.Civ.P. (12)(b)(6) is DENIED.

## V. STATUTE OF LIMITATIONS

■ The parties agree that since RICO does not contain its own statute of limitation, the Court must look to Virginia law and apply the state statute governing fraud actions. *Blanck v. McKeen,* 707 F.2d 817, 819 (4th Cir.1983). The Virginia Code, however, does not contain a specific limitation period for actions based on fraud. The Court must thus look to Virginia's general limitation provisions. Defendants contend that plaintiff's RICO and common law fraud allegations are barred by the one-year statute of limitations in '§ 8.01–248 of the Code of Virginia. Plaintiff asserts that the five-year limitation period for actions for injury to property, § 8.01–243(B) of the Virginia Code, applies.

Initially, this Court was persuaded that actions for common law fraud or RICO fraud are actions for injury to property and thus entitled to the five-year limitation period. *See Reid v. Madison,* 455 F.Supp. 1066, 1068 (E.D.Va.1978); *Proctor v. Paine,* 288 F.Supp. 836, 844 (E.D.Va.1968). While this matter was still before the Court, however, the Virginia Supreme Court issued its decision in *Pigott v. Moran,* 231 Va. 76, 341 S.E.2d 179 (1986), where the issue before the Court concerned the applicable statute of limitation in an action for damages based on common law fraud. Prompted by *Pigott,* the defendants filed a motion asking the Court to reconsider its position on the statute of limitation question.

*Pigott* provided the Virginia Supreme Court with its first opportunity to construe Sections 8.01–243 and 248 of the Virginia Code following amendments to these statutes in 1977. After discussing the new statutes, the Court concluded that the one-year statute of limitations in § 8.01–248 "governs an action for fraud." 231 Va. at ——, 341 S.E.2d at 181. This Court is, of course, bound by interpretations of Virginia statutes by Virginia's highest court.

While the one-year statute of limitation applied in *Pigott* does not necessarily govern all fraud actions, the Court finds that the factual circumstances surrounding the alleged fraud involved in this case are not distinguishable from those in *Pigott*. In *Pigott*, the Court described the alleged fraud as follows:

> The wrongful act is aimed at the person and, when sued upon at law, fraud will support a recovery for financial damage personal to the individual. This is the gist of the plaintiff's claim. The fraud allegedly committed by the realtor had no impact on the real property itself. The purchasers' land was in the same condition and was available for the same use after the alleged fraud as it was before. The defendants' conduct was directed at the plaintiffs personally and not their property, real or personal. Consequently, the trial court correctly decided the one-year limitation governs an action for fraud.

*Id.* Here, as well, the alleged fraud had no impact on the real property itself and was directed at the plaintiff corporation. Accordingly, the Court concludes that the one-year statute of limitations in § 8.01–248 of the Virginia Code governs plaintiff's RICO and common law fraud causes of action. Plaintiff is given ten days to file supplemental materials to counter defendants' contention that the RICO and common law fraud claims are not timely filed within the one-year limitation period.

## VI. MOTION FOR SUMMARY JUDGMENT

█ The Court now turns to defendants' motion for summary judgment with respect to the fraud claims in Counts I and II, and as to plaintiff's contract claim in Court III. In evaluating defendants' motion, the Court must view the evidence and the inferences drawn from the evidence in the light most favorable to the plaintiff. Summary judgment is appropriate only when the evidence and evidential inferences, viewed in this light, fail to present a genuine issue of material fact. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1280 (9th Cir.1982).

According to plaintiff's complaint, the defendants conspired to induce Bush to enter into and perform an economically oppressive contract to construct the Harbour Place Condominium project. It is claimed that the fraudulent scheme revolved around the alleged conflict of interest of the defendants James I. Ingham and Alan C. Jensen. Ingham, who negotiated the construction contract for and on behalf of Bush and was project manager for Bush on the Harbour Place project, and Jensen, the independent architect for the project, were each 25% equity participants·in defendant Harbour Place Associates, the owner of the Condominium project. Defendants do not contest the facts that underlie these potentially serious allegations of conflict of interest. Defendants contend, however, that the fraudulent scheme alleged by plaintiff fails as a·matter of law because Bush had actual and/or constructive knowledge (through its counsel) of Ingham's and Jensen's conflicts of interest. They argue that there can be no false pretenses, representations or promises with respect to facts already known by Bush.

A large amount of deposition testimony was taken concerning the issue of whether Bush had actual or constructive knowledge of Ingham's and Jensen's conflicts of interest. A number of the members of the law firm of Willcox & Savage were deposed, including one assigned to represent Bush and others assigned to represent Home Federal, the project's lender. However, even if the Court were to determine that it was conclusively established as a fact that Bush's attorneys knew of the conflict of interest, and even if that knowledge could be imputed to Bush, the fraud claims would still survive. In addition to the alleged concealment of Ingham's and Jensen's conflicts the fraudulent scheme alleged in the complaint involved a number of other acts by one or more of the defendants, including:

a) Intentionally misrepresenting construction cost and profit figures to Bush;

b) Persuading Bush to enter into a guaranteed maximum cost construction contract for an inadequate fixed price under which Bush became legally obli-

gated to absorb and pay all costs in excess of the fixed price;

c) Intentionally misrepresenting the nature of the Project as a unit-standardized (i.e., mass production) job; while initiating, promoting, and approving massive unit redesigns;

d) Intentionally misrepresenting that the Project as actually contemplated by the Project Partners could be completed within 15 months of the start of construction.

e) Processing change orders and certifying construction costs for the sole benefit of the Project Partners;

f) Reassuring Bush that the Partnership would grant extensions of time and pay for additional costs associated with the redesigns.

Plaintiff's complaint at Pars. 12, 13, 14, 25 and 26.

These alleged acts assume particular significance in an agency context. Under Virginia law, loyalty is the most important duty an agent owes to his principal:

Nothing is better settled than that a man cannot be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity, and ability. is the main consideration in the selection of agents, and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and his principal, nor to act for two principals on opposite sides in the same transaction. All such transactions are voidable, and may be repudiated by the principal, without showing that he was injured.

*James v. Anderson*, 149 Va. 113, 127–28, 140 S.E. 264, 268 (1927).

In addition to being voidable, transactions in which a fiduciary is shown to have benefitted from the fiduciary relationship are presumptively fraudulent as well. *Nicholson v. Shockey*, 192 Va. 270, 277–78, 64 S.E.2d 813, 817–18 (1951); 1A M.J. Agency, § 57 (1977). A principal may be said to have confirmed the acts of an agent only after full disclosure of the relevant facts by the agent. *Williams v. Bolling*, 138 Va. 244, 257–58, 121 S.E. 270, 273 (1923); 1A M.J. Agency, § 59 (1977). In light of the solemnity with which courts treat the fiduciary relationship, the acts set forth above would, if proved, constitute fraud regardless of whether Bush had actual or constructive knowledge of Ingham's and Jensen's conflicts of interests.

Although defendants contend that Bush was fully aware of the nature of the project and thus as a matter of law no misrepresentation or fraud occurred, the Court finds that Bush has presented documentary evidence and affidavits that create genuine issues of material fact as to these fraud allegations. Plaintiff begins by disputing Ingham's contention that numerous Bush personnel were involved in preparing and approving construction cost estimates. (Ingham Affidavit Pars. 10, 11). According to Hugh O. Overstreet, a Bush project manager, Ingham used his own figures for the contract estimates and "my involvement was ... extremely limited." (Overstreet Affidavit at Pars. 4, 5, 7). Bush's executive vice-president John J. Digges similarly stated that Ingham was in charge of cost estimates and budgets and that those estimates and budgets were relied on by Bush management. (Digges Affidavit Par. 10).

Second, plaintiff has submitted affidavits in support of its allegation that Ingham knowingly understated certain significant costs in the preparation of his budget for the Harbour Place Project, including the cost of concrete work, the cost of building the parking garage and the amount set aside for "general conditions." (*See* Whitley Affidavit Pars. 5, 6; Overstreet Affidavit Pars. 4, 5). Third, plaintiff has submitted affidavits supporting its allegation that defendants misrepresented the nature of the project as involving standardized units, while promoting substantial unit redesigns. These affidavits recount a conversation between Digges and Ingham prior to the contract's execution in which Digges stated that Bush did not want to be the contractor on the Harbour Place project if there were going to be substantial unit redesigns by unit purchasers during the construction period. In response, Ingham

indicated that the construction would be standardized and that only minimal changes would be involved. (Digges Affidavit Par. 12; Whitley Affidavit Par. 8; Overstreet Affidavit Par. 10).

Plaintiff has submitted other affidavit testimony and documentary evidence concerning project timing, defendants' alleged misleading of various subcontractors, the granting of extensions and the handling of change orders. Factual disputes exist involving material issues in each of these areas as well. For instance, there are a number of factual and legal contentions to be resolved concerning the effect of the project architect's giving Bush a 350 day extension of time to complete the project. In short, the Court FINDS that there are a number of genuine issues of material fact relating to its fraud and breach of contract allegations regardless of whether Bush can be said to have had notice of Ingham's and Jensen's conflicts of interest. Accordingly, the defendants' motion for summary judgment is DENIED.

## VII. SANCTIONS

Defendants have moved for the imposition of sanctions against the plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure, on grounds that this action has no basis in law or fact. In view of the Court's denial of defendants' motions to dismiss and motion for summary judgment, the motion for sanctions is also DENIED.

IT IS SO ORDERED.