William F. BROOKS,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee,

and

Antone Construction Co., Inc., a South Carolina corporation; Anthony J. Frank; Fidelity & Deposit Co. of Maryland, a Maryland corporation, Defendants.

No. 87–1594.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1987.

Decided Nov. 25, 1987.

Raymond George Hasley (Mary J. Lynch; Rose, Schmidt, Chapman, Duff & Hasley, Washington, D.C., Lawrence J. Lewis; Vinson, Meek, Lewis & Pettit, Huntington, W.Va., on brief), for plaintiff-appellant.

David I. Pincus, Dept. of Justice (Michael C. Durney, Acting Asst. Atty. Gen.; Michael L. Paup; William S. Estabrook, Washington, D.C., Michael W. Carey, U.S. Atty., Charleston, W. Va., on brief), for defendant-appellee.

Before WIDENER, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

In the usual stakeholder case, a party with little involvement in the underlying transactions comes to court in search of a Solomonic decision awarding the stake or portions thereof to warring parties to those transactions. Here, however, the claimants had no involvement in the events giving rise to the stake. The stake at issue, totaling over $230,000, is Antone Construction Company's share of the proceeds of a mechanic's lien action in West Virginia. The plaintiff-appellant here, William F. Brooks, was on April 5, 1979, assigned Antone's interest in the mechanic's lien action as security for prior and current loans made to or guaranteed by Antone. Competing with Brooks is the United States, which claims the stake in partial satisfaction of Antone's tax deficiencies under tax liens filed November 22, 1978, and March 1, 1979. If the government's filing in Pennsylvania was effective, it was entitled to priority because it antedated the assignment of an interest to Brooks. The question then is whether a property interest in the mechanic's lien action, to be effective against Brooks, had to be perfected by the government by a filing in West Virginia before April 5, 1979. Such a West Virginia filing has not been made.

Deciding the case without a trial upon the evidence submitted by the parties, the district court found the government tax lien, filed in Pennsylvania, being anterior to April 5, 1979, had priority over Brooks' claim, and awarded the stake to the government. In this appeal, Brooks argues, first, that the assigned mechanic's lien action constitutes real property, so that to be valid the government's tax lien had to be filed in West Virginia; second, that he has priority because Antone is a resident of South Carolina and not of Pennsylvania, so that the government's filing in Pennsylvania was not effective against his interest even if the mechanic's lien is personal property; and third, that the government has no valid tax lien against Antone because the Internal Revenue Service agreed to a compromise settlement of Antone's tax liabilities and should be estopped from denying the settlement. Brooks so contends even if the settlement is procedurally defective, because the Service kept money paid by Antone's president in furtherance of the compromise offer.

We see no basis for overturning the District Court's decision in this case. The property at issue, the mechanic's lien, is a chose in action and constitutes personal property, so the government was not required to file its tax lien in West Virginia. The standard of review for the district court's factual findings is the "clearly erroneous" standard. Fed.R.Civ.P. 52(a). It was reasonable, and certainly not clearly erroneous, to conclude from the evidence that Antone's principal executive office was in Pennsylvania, so the tax liens were properly filed there and have priority over Brooks' security interest. The compromise settlement is not enforceable; and even though Brooks has standing to challenge the government's tax lien, Brooks cannot estop the government from denying the unenforceable settlement and cannot challenge Antone's underlying tax deficiency assessment.

## FACTS

The basic facts are essentially not in dispute, except for the determination of Antone's corporate residence.

### A. Facts relating to Antone Construction Company's residence

Antone was incorporated in South Carolina in March, 1977. A South Carolina attorney prepared the articles of incorporation, listing himself as the registered agent and his own law office as the required registered address for the corporation. The incorporation was done at the request of an attorney in Sharon, Pennsylvania on behalf of Anthony J. Frank of Hermitage, Pennsylvania. Anthony Frank apparently set up Antone upon the recommendation of his brother, Frederick Frank; while Antone was being formed, Frederick became a resident of Columbia, South Carolina. Anthony Frank, whose Pennsylvania residence remained undisturbed, was also the President and sole stockholder of Brimar Construction Company at the time of Antone's incorporation; Brimar's principal executive office was in Sharon, Pennsylvania.

The directors and officers of Antone were Anthony Frank (president and treasurer-comptroller), Frederick Frank, and Bernard Rosen (an employee of Brimar). Antone was involved as a subcontractor in construction projects in six states, including South Carolina but not including Pennsylvania. The first project it undertook was in Columbia, South Carolina. There, as at its other construction sites, Antone maintained a project office where records related to the project were kept. Frederick Frank maintained an office in his home in South Carolina in addition to the project office, but the home office was discontinued when he left Antone in October, 1978. The tax liens at issue here were filed after the home office was closed and after the South Carolina project office trailer had been moved to Virginia; the sole remaining address for Antone in South Carolina was the law office of the registered agent, where Antone never conducted any business or kept any records. All executive decisions (as compared with day-to-day decisions made by managers at each project site) for Antone were apparently made by Anthony Frank in Pennsylvania or wherever he happened to be.

Checking accounts were maintained at a bank near each project to pay suppliers and employees. Payments for work were received at the local office but forwarded to Anthony Frank in Pennsylvania. Anthony Frank also arranged to send money from Pennsylvania as needed to replenish local checking accounts. Antone also had checking accounts at a bank in Sharon, Pennsylvania; the mailing address for Antone for the accounts was P.O. Box 1278, Sharon, Pennsylvania. Antone's registered agent in South Carolina used the same Pennsylvania post office box to send materials to Antone, addressed in care of a Brimar employee.

Antone and Brimar filed a consolidated federal income tax return for the taxable period ending January 31, 1978, prepared by a Sharon, Pennsylvania accounting firm using information supplied by Anthony Frank. Antone was listed as Brimar's subsidiary on that return, and Antone's address was given as Box 1278, Sharon, Pennsylvania. The same address was given by Antone in its Employer's Monthly Federal Tax Returns filed with the IRS in February, March, and April, 1979.

The only known meeting of the Antone Board of Directors was held on October 9, 1978 at Brimar's offices in Sharon, Pennsylvania. At that meeting, Anthony Frank's wife and mother-in-law replaced Frederick Frank and Bernard Rosen as directors of Antone. Anthony Frank remained the third director; his wife also became an officer of Antone.

In December, 1978, Antone filed an application for a certificate of authority to operate as a foreign corporation within Pennsylvania. The address given as Antone's proposed Pennsylvania registered office was "155 Snyder Road, Sharon (Hermitage), Pennsylvania"—Brimar's office address. Brooks stresses that the address given for the "principal office" of Antone is 1200 First National Bank, Richland County, South Carolina and argues that the listing should be dispositive on the issue of Antone's residence because it is a "public record." However, the form merely requested "the address of its principal office

in the state or county of incorporation," and the address given in response is thus not by necessity the corporation's "principal executive office" for purposes of tax lien filing. On January 5, 1979, the Pennsylvania Department of State issued the requested certificate of authority listing the Snyder Road address (Brimar's offices) as the address of Antone's registered office in Pennsylvania.

There is some dispute about the actual ownership of Antone; Brimar apparently did not follow through on a stock purchase agreement, and the stock was then purchased by Anthony Frank's mother-in-law. The stock may have been owned instead by Anthony and Mary Frank's children. Recordkeeping was disorganized; it appears that Antone's business activities petered out in 1979. On October 6, 1980, Antone was dissolved by the state of South Carolina. Anthony Frank was killed in a car accident in February, 1985, after interrogatories had been answered but apparently before any deposition was taken. It is clear from the record, however, that Anthony Frank controlled Antone and made all executive decisions, including deciding what projects to bid on.

B. *Facts relating to Brooks' loans and security interest*

In October and November, 1978, Brooks made three loans totaling $92,000 to Anthony Frank, apparently for the use of Brimar Construction Company. In November, 1978, Brimar executed a promissory note to Brooks for the loans (signed by Anthony Frank); Anthony and Mary Frank (his wife) personally guaranteed Brimar's obligation.

On April 5, 1979, *after* tax lien notices had been filed in Pennsylvania by the IRS against Antone, Brooks made a fourth loan of $23,000 to Antone. On the promissory note, Antone referred to itself as a "South Carolina corporation" but listed its address as "P.O. Box 1278, Sharon, Mercer County, Pennsylvania 16146." Anthony and Mary Frank personally guaranteed the loan. Also on April 5, 1979, Antone (by Anthony Frank) executed a document guaranteeing

Brimar's preexisting $92,000 obligation to Brooks.

To secure the four loans, on April 4 and 5, 1979, Antone executed two documents assigning Brooks a partial interest ($115,000 plus interest) in the anticipated proceeds (approximately $253,000) of a mechanic's lien action that was then pending in Cabell County, West Virginia. The record does not indicate why two different documents were executed. The two documents are substantially identical except that the April 4 assignment identifies Antone Construction Company as being located at P.O. Box 1278, Sharon, Mercer County, Pennsylvania, while the April 5 assignment identifies Antone as a "corporation organized and existing under the laws of the State of South Carolina." The April 5 assignment was later recorded by Brooks in the office of the Clerk of Cabell County, West Virginia on April 30, 1979.

### C. *Facts relating to Government tax liens*

In late 1978, Antone became delinquent in its payment of Social Security (FICA) and unemployment (FUTA) taxes. The Internal Revenue Service made tax assessments in late 1978 and early 1979, and filed tax lien notices against Antone with the Prothonotary of Mercer County, Pennsylvania (where Sharon and Hermitage are located) on November 22, 1978, and March 1, 1979.[1]

Anthony Frank also had personal tax difficulties, as did his Brimar Construction Company. As of April, 1983, the liabilities of Anthony Frank personally, Antone, and Brimar totaled about $800,000. On April 29, 1983, Anthony Frank submitted an offer to the IRS to settle all three liabilities for a total of $250,000. The investigating officer, Robert C. Quigley, had met several times with Anthony Frank to negotiate the offer. Anthony Frank made statements that led Quigley to believe that Anthony Frank was going to offer a bribe to obtain expeditious acceptance of the compromise offer. Quigley reported his suspicions to the IRS Internal Security Division, which wired Quigley for sound and supervised all subsequent meetings. On June 28, 1983, Anthony Frank stated he would give Quigley a new car if Quigley would produce a letter from the IRS accepting the offer by a certain date. The next day, Quigley delivered to Anthony Frank an "acceptance" letter bearing the stamped signature of the IRS Pittsburgh District Director; the letter had been prepared by Quigley at the direction of Inspectors from the Internal Security Division. In a complaint filed by Anthony Frank, Antone and Brimar asking a district court in Pennsylvania to enforce the compromise, Anthony Frank alleged that "[f]rom April 27, 1983 up to and including June 28, 1983, Agent Quigley made continued representations to Plaintiffs and others, including the escrow agent and third party's attorneys, that said offers in compromise would be accepted." Anthony Frank did give Quigley a new Oldsmobile, which Quigley turned over to the inspectors. On July 12, 1983, Anthony Frank gave Quigley a cashier's check for $250,000 made out to the Internal Revenue Service, and the inspectors arrested Anthony Frank for bribery.

Anthony Frank was charged in the District Court for the Western District of Pennsylvania with attempting to bribe a public official, and a copy of the cashier's check was introduced into evidence at the trial. At the conclusion of the Government's case, Frank was granted a judgment of acquittal. *See United States v. Frank,* 763 F.2d 551, 552 (3d Cir.1985) (describing bribery trial as background for dispute over check proceeds claimed by Brimar's partner in joint venture).

On February 22, 1984, the IRS sent a letter to Anthony Frank in his capacity as President of Antone stating that it had rejected Antone's settlement offer and demanding payment of the outstanding liabilities in full. The offers of Brimar and Anthony Frank were also rejected. On March 9, 1984, the IRS sent a letter to Anthony Frank stating that it had determined that his offers and his tender of the cashier's check were

---

1. Another tax lien notice was filed September 18, 1979, but that lien is not at issue in the case.

not made in good faith and were a fraudulent attempt to relieve yourself and your corporations of the tax liabilities in question without making adequate payment. In connection therewith, you attempted to bribe the revenue officer. Because of these illegal actions, the check is not returnable to you.

The IRS applied the proceeds of the check first to Brimar's outstanding tax liabilities, second to Anthony Frank's liabilities arising from an unidentified sole proprietorship, and last to Anthony Frank's personal liabilities as a responsible officer of two corporations, Brimar and Antone, that had failed to pay the IRS sums withheld from employee wages. The money was applied to Brimar's liabilities and not to Antone's because the money in the escrow account had been earned by Brimar through its joint venture with the Gibson companies.[2]

## DISCUSSION

### I. *Priority of government tax lien*

Brooks obtained and recorded in West Virginia his security interest in the disputed funds after the government filed its tax lien notices in Pennsylvania. To have priority over the government's liens, therefore, Brooks must establish that the government's notices were not filed in the proper place under 26 U.S.C. § 6323(f) (1967 & Supp.1986). He asserts that the validity and priority are established only by filing in West Virginia.

### A. *Nature of property at issue*

The case presents the preliminary question of whether a claim to the proceeds of a successful attempt to establish by judicial process a right to a mechanic's lien (the anticipated proceeds of which were assigned to Brooks as security for a loan) is real property or personal property. If it is real property, then to have priority over Brooks, the government's tax lien had to be filed in West Virginia, the situs of the land against which Antone's mechanic's lien was filed and where the lien was enforced. 26 U.S.C.A. § 6323(f)(2)(A) (Supp.1987). If the claim is personal property, however, or a "chose in action," as described by the district court, then it could properly have been filed in Pennsylvania, the state where Antone (the corporation initially holding the mechanic's lien and assigning the right to the proceeds thereof to Brooks) resided. *Id.* § 6323(f)(2)(B). Here, the government filed a tax lien only in Pennsylvania. Therefore, if the district court erred in its ruling that the claim to the proceeds from a mechanic's lien was personal property, the government's claim is ineffective against Brooks.

A mechanic's lien has been defined as "a claim created by law for the purpose of securing payment of the price or value of work performed and materials furnished in erecting or repairing a building or other structure or in the making of other improvements on land, and as such it attaches to the land as well as to the buildings erected thereon." 53 Am.Jur.2d, Mechanic's Liens, § 1, at 512 (1970) (footnotes omitted). The right to acquire and enforce a mechanic's lien exists solely by positive statutory enactments; there was no mechanic's lien in the common law or in equity. *Id.* § 2, at 515; *Kendall v. Martin,* 136 W.Va. 192, 197, 67 S.E.2d 42, 45 (1951); *United States Blowpipe Co. v. Spencer,* 40 W.Va. 698, 705, 21 S.E. 769, 772 (1895). Antone's lien was filed pursuant to W.Va. Code § 38–2–2 (1985) (lien of subcontractor).

A mechanic's lien gives the lienor a right to demand the sale of the property to which the lien attaches if the debt is not paid. 53 Am.Jur.2d, Mechanic's Liens, § 3, at 518 (1970). The lien is described as "purely a matter in rem and not in personam." *Id.*

---

**2.** Ultimately, the IRS retained only $50,000 of the proceeds of the check. The Gibson companies, which had been involved in joint ventures with Brimar and had agreed to release the $250,000 from an escrow account in the belief that Frank was properly settling Brimar's tax obligations with the IRS, sued to recover the proceeds. The Third Circuit held that the district court had jurisdiction to determine ownership of the proceeds of a check used as evidence. *United States v. Frank,* 763 F.2d 551 (3d Cir.1985). The IRS then settled the dispute, returning $200,000 to the Gibson companies and keeping $50,000 to apply to Brimar's outstanding tax liabilities.

However, this does not mean that the holder of the right to the proceeds from a mechanic's lien holds an interest in real property:

> While a mechanic's lien is sometimes said to be property, it is not like a mortgage. It is not an interest in land, but operates in the nature of an attachment or garnishment. . . .

*Id.*[3] Indeed, early cases involving mechanic's liens denied the holder the power to assign his lien to another:

> There is some early authority which, in the absence of a statute to the contrary, and under the influence of the early common-law rule as to the nonassignability of choses in action, treats a mechanic's lien, even after it has been perfected by the person who performed the labor or furnished the materials, as a personal right which cannot be assigned so as to enable the assignee to prosecute the claim in his own name.

*Id.* § 287, at 823.[4] The concept that the mechanic's lien is a chose in action is supported by early cases, dating from the time when that distinction played a greater role than it plays in modern jurisprudence. One example is *Clement v. Reitz*, 103 Ill. 315 (1882), where the court ruled that it had no jurisdiction to hear a case involving enforcement of mechanic's liens because no "freehold" was involved:

> Payment of the sum ascertained to be due to [the materialmen] would relieve the land entirely from the lien established. How, then, is a freehold any more involved than in a suit to foreclose a mortgage? It has frequently been decided by this court that in a proceeding by bill to foreclose a mortgage a freehold is not involved. No difference in princi-

ple is perceived in the cases. In one case the lien is created by mortgage-deed, and in the other it is given by statute, and the proceeding in either case is simply to foreclose the lien.

*Id.* at 316. The same result was reached by the Colorado Supreme Court in *Spangler v. Green*, 21 Colo. 505, 507, 42 P. 674, 675 (1895) (court lacked jurisdiction because insufficient monetary amount in controversy and "proceeding to enforce a mechanic's lien does not involve a freehold"). The Supreme Court of Minnesota was even more emphatic:

> The assertion that the statutory right of a mechanic or a material man to enforce a lien is not an estate or interest in the land on which the work of one or the materials of the other may have been performed or furnished need not be supported by argument or illustration.

*Burns v. Carlson*, 53 Minn. 70, 71–72, 54 N.W. 1055, 1055 (1893). The court held in *Burns* that because the mechanic's lien was simply a lien and not an interest in real property, "[l]ike other lien rights, it may be lost or abandoned or discharged." *Id.* at 72, 54 N.W. at 1055. The Supreme Court of Oregon articulated a similar view, holding that

> it is clear that the mere right or privilege of preserving and perpetuating a mechanic's lien upon buildings is not an interest in land. The right may be allowed to lapse, or its duration may be terminated by a payment of the demand without a release; and a written waiver, without the observance of any of the formalities of acknowledgement, etc., required touching instruments affecting land, will constitute an insuperable barri-

---

**3.** The characterization of the mechanic's lien action sometimes appears to depend on the court's view of particular proceedings. *Compare Bernhardt v. Brown*, 118 N.C. 700, 706, 24 S.E. 527, 528 (1896) ("judgment to enforce a mechanic's lien was a proceeding in rem") *with Rutherford v. Ray*, 147 N.C. 253, 259, 61 S.E. 57, 59 (1908) ("We do not think that an action to enforce the lien given for 'material furnished' is a proceeding quasi in rem. The debt is the personal liability founded upon contract. The action is to recover judgment for the debt.").

**4.** Most courts permitted the assignment of mechanic's liens, however, under accepted practices of assigning claims. *E.g., Davis v. Bilsland*, 85 U.S. (18 Wall.) 659, 661, 21 L.Ed. 969 (1873) (statutory mechanic's lien can be enforced by assignee in his own name, under Civil Practice Act of Montana, "which provides that actions shall be prosecuted in the name of the real party in interest. . . . When assigned, the claim really belonged to the plaintiff.").

er to the enforcement of a lien thus waived, so that the essential characteristics attending instruments effecting [sic] real property are especially wanting.... *Hughes v. Lansing,* 34 Or. 118, 124, 55 P. 95, 97 (1898). *See, e.g.,* W.Va.Code § 38–2–34 (1985) (suit to enforce mechanic's lien must be commenced within six months of lien filing).

In fact, as at least one court specifically noted, the mechanic's lien holder's "claim against the property is secondary, ancillary." *Alberti v. Moore,* 20 Okl. 78, 86, 93 P. 543, 546–47 (1908). The Oklahoma Supreme Court also noted, "The contractor is the primary debtor. If the amount could be collected from him, there would be no resulting claim against the property of the owner." *Id.* at 86, 93 P. at 546. In that case, where the mechanic's lienor was a subcontractor, the Oklahoma statute required that the contractor be a party defendant in the suit to enforce the lien, so that a judgment could be secured against the contractor for the arrears; the judgment was levied against the property only if the contractor failed to pay the judgment. *Id.* at 86, 93 P. at 546–47. *See Chambers Lumber Co. v. Gilmer,* 60 Ga. App. 832, 835, 5 S.E.2d 84, 87 (1939) ("As to the contractor the obligation is primary; as to the owner it is collateral only....").

It is thus clear from the early cases and from the nature of the mechanic's lien proceeding itself that a mechanic's lien and, *a fortiori,* a claim to the proceeds of a mechanic's lien is a chose in action, and that an action to enforce a mechanic's lien is substantially an in personam action and not an in rem action. "Whether a proceeding is in rem or in personam is determined by its nature and purpose, and by these only." 1 Am.Jur.2d, Actions, § 39, at 572–73 (1962). A mechanic's lien falls within the following definition of in personam action:

A proceeding in personam is a proceeding to enforce personal rights and obligations brought against the person and based on jurisdiction of the person, although it may involve his right to, or the exercise of ownership of, specific property, or seek to compel him to control or

dispose of it in accordance with the mandate of the court.

*Id.* at 573 (footnotes omitted). By contrast, a proceeding in rem "is essentially a proceeding to determine the right in specific property, against all the world, equally binding on everyone." *Id.* § 40, at 573. A mechanic's lien action merely settles the claim of an unpaid mechanic or materialman, and does not purport to settle or clear title to the property carrying the lien.

The policies behind the filing requirements for government tax liens are satisfied by our finding that a mechanic's lien is a chose in action, and that the tax lien filed in Pennsylvania, Antone's state of residence, therefore gives the government priority over a subsequent assignee of the mechanic's lien. If Brooks' assigned interest were in the underlying real property, the land in West Virginia, it is well settled that he should be required to do no more to protect his security interest than properly inspect the land records in West Virginia to establish that the land is otherwise unencumbered. Here, however, Brooks was assigned an interest in a lawsuit that Antone had pending in West Virginia to collect money due for Antone's construction work. The claim made by Antone is tantamount to an effort to collect on unpaid accounts receivable, which certainly involves no interest in real property. The mechanic's lien procedure is merely a remedy provided by West Virginia, and by virtually all other states, to ensure that mechanics and materialmen are able to collect on their accounts receivable. The Supreme Court of Appeals of West Virginia has held that "[t]he lien procedure provided for mechanics and materialmen is a cumulative remedy, and independently of the lien, such parties may resort to the ordinary common-law remedies, as by an action to recover a personal judgment. The two remedies may be pursued simultaneously, but there can be only one satisfaction." *Woodford v. Glenville State College Housing Corp.,* 159 W.Va. 442, 225 S.E.2d 671, 675 n. 6 (1976) (citing *West Virginia Sanitary Engineering Corp. v. Kurish,* 137 W.Va. 856, 74 S.E.2d 596 (1953)). Thus, the special benefit to Brooks of obtaining the assignment of the

claim to the mechanic's lien proceeds instead of other accounts receivable, for example, was that the holder of a mechanic's lien has a much greater chance of collecting *from the person owing on account* than he would have of collecting on such an account ordinarily. This greater likelihood of collecting an overdue account does not also mean that there is a greater likelihood of prevailing over parties holding prior liens against the *debtor/assignor*, however. It is well established that "the assignee steps into the shoes of the assignor, taking it subject to all prior equities between previous parties ... for the holder can only sell and transfer such interest as he has...." *Thomas v. Linn*, 40 W.Va. 122, 127, 20 S.E. 878, 880 (1894). Here, Brooks' joy at the success of the mechanic's lien action unfortunately must be tempered by the knowledge that he was assigned personal property, and not an interest in real property, so that the government's prior tax lien will take priority over his assignment if the tax lien was properly filed in the state of Antone's corporate residence.

### B. *Proper filing of tax lien*

Notices of tax liens on personal property, whether tangible or intangible, must be filed "at the residence of the taxpayer at the time the notice of lien is filed." 26 U.S.C.A. § 6323(f)(2)(B) (Supp.1987). For purposes of that provision, "the residence of a corporation or partnership shall be deemed to be the place at which the principal executive office of the business is located." *Id.* § 6323(f)(2).

The general rule in determining the priority of liens is that "the first in time is the first in right." *United States v. New Britain*, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954). However, for a tax lien to have priority over a perfected security interest, notice of the tax lien must be properly filed under § 6323(f) before the competing security interest is perfected. 26 U.S.C.A. § 6323(a) (Supp.1987). Here, the government tax lien notices were filed in Pennsylvania before Brooks perfected his security interest in the anticipated proceeds of the West Virginia mechanic's lien

action. Therefore, the government lien takes priority if Antone's principal executive office was in Pennsylvania, as the district court held it was.

■ The test in § 6323 for corporate "residence" is different from the residency test used for evaluating diversity jurisdiction. *Dimmitt & Owens Financial, Inc. v. United States*, 787 F.2d 1186, 1191 (7th Cir.1986). In enacting § 6323, the Congress explicitly rejected the proposal (made by the Internal Revenue Service) that corporate residence be determined by the taxpayer's domicile. S.Rep. No. 1708, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.Code Cong. & Admin.News 3722, 3732. The objective of the residency test in § 6323 is to make "the identification of the place for filing and searching for liens as simple and certain as possible." *Dimmitt & Owens*, 787 F.2d at 1191. Thus, a corporation's residence for purposes of § 6323 is not necessarily one of its registered offices or its place of incorporation. *Dimmitt & Owens*, 787 F.2d at 1190; *S. D'Antoni, Inc. v. Great Atlantic & Pacific Tea Co.*, 496 F.2d 1378, 1382–83 (5th Cir.1974). This court has not pronounced directly on the point. The only Fourth Circuit cases cited by Appellant involve diversity jurisdiction, where the residence inquiry is explored for a different reason: to protect out-of-state litigants from possible unfair adjudication by local fact-finders.

The Seventh Circuit has adopted a "nerve center" test for establishing a corporation's principal place of business. *Dimmitt & Owens*, 787 F.2d at 1191; *Kanzelberger v. Kanzelberger*, 782 F.2d 774, 777 (7th Cir.1986); *Sabo v. Standard Oil Co.*, 295 F.2d 893 (7th Cir.1961). The Fifth Circuit has held that the principal executive office "is the headquarters of the business—the office at which the major executive decisions affecting the business are made." *S. D'Antoni, Inc.*, 496 F.2d at 1383. The Seventh Circuit reached the same conclusion in *Dimmitt & Owens*, holding that although the corporation had its major asset (a manufacturing plant) in California, the headquarters in Illinois constituted the principal executive office be-

cause the officers of the company, most corporate financial records, and other typical headquarters activities were located in Illinois. 787 F.2d at 1191–92. The test adopted by the Fifth and Seventh Circuits is consistent with the language of § 6323 and its legislative history. If Congress had intended to establish corporate residence at its place of incorporation or its registered office, it could easily have done so. *See S. D'Antoni, Inc.*, 496 F.2d at 1383.

Applying that test to the facts of the present case, it is clear that the district court's finding is not "clearly erroneous" and should stand. Despite the transient presence of field offices at construction sites in the several states where Antone operated, the executive decisions were consistently made by Anthony Frank in Pennsylvania. Indeed, at the time the tax lien notices were filed, the South Carolina job site office and the South Carolina office in Frederick Frank's basement were closed. The only remaining office in South Carolina was the incorporating attorney's law office, which served only as a mail drop; no corporate business was transacted there. Except for incorporating in South Carolina, there is little if any evidence in the record that Anthony Frank attempted to establish or maintain South Carolina residency for Antone Construction. The filing of a consolidated federal tax return denoting Antone as a subsidiary of Brimar and giving a Sharon, Pennsylvania address for Antone certainly indicate that Anthony Frank considered the corporation to be effectively based in Pennsylvania.

Brooks argues that applying this kind of test for corporate residence introduces uncertainty into the process of searching for tax liens, and protests that the Pennsylvania residence was not recorded in "public records." The courts cited above did not make a distinction between public and private records. Rather, they looked at various indications of corporate residence to establish which office is "the most readily identifiable" as the principal office. *Dimmitt & Owens*, 787 F.2d at 1191. Here, all factors point to Pennsylvania except for the incorporation papers. Some public

records also point to Pennsylvania; for example, a Pennsylvania address was given in Antone's South Carolina annual report for the location of Antone's corporate books.

In addition, it is unreasonable for Brooks to protest that he was unfairly surprised by the finding that Antone resided in Pennsylvania. Brooks made loans over a period of several months to Frank, Brimar, and Antone, and secured guarantees by each for the various loans. When the assignment involved here was made, Brooks' lawyer went to Pennsylvania to secure the proper signatures, including a signature to bind Antone. Brooks obviously knew where Antone's "nerve center," or principal corporate executives, were located. In addition, the prudent creditor can require production of tax returns and other relevant financial materials before extending loans; in this case, the tax return would have disclosed Antone's consolidated filing with Brimar and the listing of a Pennsylvania address.

## II. *The purported settlement of Antone's tax liabilities*

The district court properly held that the compromise settlement cannot be enforced against the government despite the superficially apparent acceptance of Frank's offer. Sections 7121 and 7122 of the tax code govern settlement of disputed tax liabilities, and authorize the Secretary of the Treasury or his delegate to enter into written agreements to settle disputes over tax liability and to compromise any civil or criminal case arising under the internal revenue laws. 26 U.S.C.A. § 7121, 7122 (1967 & Supp.1987). Section 7122 is the exclusive method by which tax cases may be compromised. *Botany Worsted Mills v. United States*, 278 U.S. 282, 288–89, 49 S.Ct. 129, 131–32, 73 L.Ed. 379 (1929) (prior version of statute); *Shumaker v. Commissioner of Internal Revenue*, 648 F.2d 1198, 1199–1200 (9th Cir.1981); *Country Gas Service, Inc. v. United States*, 405 F.2d 147, 149 (1st Cir.1969); *United States v. Hardy*, 299 F.2d 600, 605–06 (4th Cir.1962); *Brast v. Winding Gulf Colliery Co.*, 94 F.2d 179, 181 (4th Cir.1938). *See Holland*

*v. Commissioner of Internal Revenue,* 622 F.2d 95, 97 (4th Cir.1980) (no binding agreement where form setting forth tax deficiency not approved by District Director).

■ The requirements of those statutes and accompanying regulations are strictly construed. *Botany Worsted Mills,* 278 U.S. at 288–89, 49 S.Ct. at 131–32, *cited with approval in Yarborough v. United States,* 230 F.2d 56, 62 (4th Cir.1956). The letter of acceptance given to Frank was signed by the Pittsburgh IRS District Director (actually, stamped with his signature), but the authority to settle disputes involving unpaid liability over $100,000 is granted only to IRS Regional Commissioners and Regional Counsel. Delegation Order 11 (Rev. 13), 1982–1 Cum.Bull. 333. Thus, even if the District Director had signed the letter and intended to accept Frank's offer of compromise, the acceptance would have been ineffective. *See, e.g., Botany Worsted Mills v. United States,* 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379 (1928) (attempted informal settlement by subordinate officials did not constitute binding agreement); *Dorl v. Commissioner of Internal Revenue,* 507 F.2d 406, 407 (2d Cir.1974) (letter of assurance from revenue officer not authorized to compromise under § 7121 does not bind United States); *Reimer v. United States,* 441 F.2d 1129, 1130 (5th Cir.1971) (per curiam) (United States not bound by apparent settlement where agent without authority to compromise taxpayer's tax liability and form stated that IRS not waiving right to further assessment); *Country Gas Service v. United States,* 405 F.2d 147, 149–50 (1st Cir.1969) (because exclusive means of compromise established by § 7122 not used, any arrangement taxpayer made with agent had no legal standing); *McGee v. United States,* 566 F.Supp. 960 (M.D.Fla. 1982) (government not bound by agreement allowing installment payments where agreement not signed by qualified delegate under § 7122).

Those cases and others have held that the exclusivity of § 7122 bars enforcement of apparent agreements under general concepts of accord and satisfaction. *See, e.g.,* *Bowling v. United States,* 510 F.2d 112, 113 (5th Cir.1975); *Moskowitz v. United States,* 285 F.2d 451, 453, 152 Ct.Cl. 412 (1961). Therefore, despite Brooks' arguments to the contrary, the fact that the government kept and applied to claims against Brimar and Anthony Frank the $250,000 tendered with the compromise offer does not create an enforceable settlement.

■ Even if the purported acceptance letter had been signed by an authorized official, the settlement could have been set aside by the government because of Anthony Frank's attempt to bribe the IRS agent. It is well established that an agreement with the government obtained by fraud cannot be enforced against the government. *Pan American Petroleum & Transport Co. v. United States,* 273 U.S. 456, 500, 47 S.Ct. 416, 422, 71 L.Ed. 734 (1927); *Crocker v. United States,* 240 U.S. 74, 80–81, 36 S.Ct. 245, 247–48, 60 L.Ed. 533 (1916). Brooks urges that Anthony Frank's acquittal on the bribery charge bars the application of the principle to the settlement in question; but it is also well established that because of the different burdens of proof involved, acquittal of a criminal charge is not *res judicata* in a civil case. *United States v. National Association of Real Estate Boards,* 339 U.S. 485, 492–94, 70 S.Ct. 711, 715–17, 94 L.Ed. 1007 (1950) (Sherman Act); *Helvering v. Mitchell,* 303 U.S. 391, 397, 58 S.Ct. 630, 632, 82 L.Ed. 917 (1938) (income tax). Here, nothing in the record or the briefs indicates that the district court's finding of fraud was clearly erroneous.

■ We also agree with the district court that Brooks lacks standing to attempt to estop the Government from asserting its tax lien against Antone. It is true that the tax code requires that "[u]pon the rejection of any such offer [made under § 7122], the Secretary or his delegate shall refund to the maker of such offer the amount thereof." 26 U.S.C.A. § 7809 (1967 & Supp.1987). But Brooks' reliance on the provision is unavailing, because Brooks was not the maker of the offer. *See Ralston Steel Corp. v. United States,* 340 F.2d 663, 669–72, 169 Ct.Cl. 119 (1965), *cert.*

*denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965). Brooks has no standing to challenge transactions to which he is a stranger. The tax code gives Brooks standing to bring a civil action challenging the government's levy on property in which Brooks has a competing property interest, 26 U.S.C.A. § 7426(a)(1) (1967 & Supp. 1987); but Brooks may not challenge the underlying tax assessment, which is conclusively presumed to be valid. *Id.* § 7426(c). Once the compromise transaction was voided by Anthony Frank's actions, the IRS was entitled to treat the $250,000 as any other assets of the delinquent taxpayers in government possession. In the present case, the government found only $50,000 of the fund actually belonged to one of the taxpayers at issue (Brimar), and turned the remainder over to the Gibson Companies.

Similarly, Brooks cannot estop the government from denying the existence of a settlement. As noted above, the exclusivity of § 7122 prevents the application of general contract rules to enforce apparent agreements between the IRS and taxpayers. Anthony Frank's fraudulent actions in connection with making the offer of compromise would probably estop him or his estate from making a claim for refund, in any event. *See Coy v. United States,* 377 F.2d 925, 928 (9th Cir.1967) (compromise money, which was filched from government by taxpayer through misrepresentation of sale price of property subject to tax lien, could be kept by IRS despite rejection of offer). If Brooks were standing in the shoes of Anthony Frank, he could not estop the government because Anthony Frank's attempted fraud vitiated the whole transaction. And Brooks cannot attempt to estop the government on his own behalf, because he did not detrimentally rely on the government's apparent acceptance of Anthony Frank's offer. The loans and security interest under which Brooks claims were transacted in 1978 and 1979; the settlement-related activities occurred in 1983.

The order of the district court is

AFFIRMED.