AGENCY SERVICES OF VIRGINIA, INC., Plaintiff,

v.

CANAL INSURANCE COMPANY, et al. Defendants.

Civil Action No. 3:92CV529.

United States District Court, E.D. Virginia, Richmond Division.

Feb. 4, 1993.

Claudia Talley Farr, David Frankman Peters, Cheryl Grissom Ragsdale, Hunton & Williams, Richmond, VA, for Plaintiff.

Henry Hanna McVey, III, McGuire, Woods, Battle & Boothe, Richmond, VA, Robert J. Wishart, Pamela S. Duffy, Brian P. Gavigan, Wishart, Norris, Henninger & Pittman, Burlington, NC, for Canal Insurance Company, W.E. Love & Associates, Inc.

Albert Peter Brodell, Walter Scott Street, III, Williams, Mullen, Christian & Dobbins, Richmond, VA, Sarah Hopkins Finley, C. James Williams, III, Glen Allen, VA, for Watson & Associates, Inc., Fire & Casualty Insurance Company of Connecticut.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court for resolution following a bench trial conducted on January 22, 1992. The Court now renders judgment in favor of the defendants and makes the following Findings of Fact and Conclusions of Law, pursuant to Rule 52 of the Fed.R.Civ.P., also incorporating by reference the stipulations of the parties:

## FINDINGS OF FACT

### I. THE PARTIES

1. Agency Services of Virginia, Inc. and Agency Services Inc. of Virginia (the same corporate entity, thus collectively, "ASI") is an insurance premium finance company that is incorporated in the State of Maryland and duly licensed by the Bureau of Insurance, Virginia State Corporation Commission (the "Bureau"), to transact business in the Commonwealth of Virginia. Stipulation.

2. Canal Insurance Company ("Canal") is incorporated in the State of South Carolina and licensed by the Bureau. Stipulation.

3. Fire & Casualty Insurance Company of Connecticut ("Fire & Casualty") is incorporated in the State of Connecticut and duly licensed by the Bureau to transact business in the Commonwealth of Virginia. Stipulation.

4. W.E. Love & Associates, Inc. ("Love") is a general agent that is incorporated in the State of North Carolina and licensed by the Bureau as a nonresident insurance agency. Stipulation.

5. Watson & Associates, Inc. ("Watson") was a Virginia corporation that was duly licensed by the Bureau as a property and casualty insurance agent. Stipulation.

6. On March 20, 1992, Betty E. Watson, sole shareholder of Watson, sold 100% of her shares to Charles E. Lewis, Jr. ("Lewis"). Pl.Ex. 38, 39.

7. From April to September 1992, Lewis was the sole shareholder and president of Watson. Stipulation. On September 1, 1992, Watson's corporate existence was terminated by operation of law. Pl.Ex. 45.

## II. THE BUSINESS RELATIONSHIPS BETWEEN THE PARTIES

### A. Relationship Between Love and Canal

8. At all relevant times, Love served as a general agent for Canal, "to receive and accept proposals for insurance, and issue and countersign policies of insurance, covering such classes of risk as the Company may, from time to time, authorize to be insured," pursuant to an "Agency Agreement" executed on February 23, 1982. Pl.Ex. 12, ¶ A(1).

9. Canal paid Love a commission for all policies placed by the latter with Canal. Both parties agreed to handle all their transactions an "accounts current system," pursuant to which Canal could offset any debts owed it by Love and arising from the scope of the Agency Agreement, against any commission or other credit (including return premiums) due Love. Pl.Ex. 12, ¶¶ A(1) and B.

10. Under the Agency Agreement, Love is responsible to Canal for payment of all earned premiums whether or not collected from the insured, subagent or producer, and is also has to refund all unearned commissions on policies for which return premiums are due to Canal. Love is further required to indemnify and hold Canal harmless from any losses that may result from unauthorized acts or transactions by Love, his employees, or any subagents under his control. Pl.Ex. 12, ¶¶ B(2), A(5).

### B. Relationship Between Love and Fire & Casualty

11. At all relevant times, Love also served as a general agent in Virginia for Fire & Casualty, with the authority to underwrite policies on its behalf, pursuant to a "Managing General Agency Agreement" executed on January 17, 1989. Pl.Ex. 11, § 1 ¶ A.

12. Fire & Casualty paid Love a commission for all policies placed with it, and both parties agreed to handle all transactions between them on an accounts current system, pursuant to which Fire & Casualty could offset any of Love's debts arising from the scope of their agreement against any commission or other credit (including unearned premiums) owed to Love. Pl.Ex. 11, §§ 7 ¶ D, 10 ¶ C.

13. In addition, Love is required to collect and pay all premiums due Fire & Casualty, whether or not collected from the insured or subproducer. Pl.Ex. 11, § 7 ¶ B. Love is further obligated to refund all unearned commissions on policies for which return premiums are due Fire & Casualty, and to indemnify Fire & Casualty from unauthorized transactions or negligence by Love or any of its sub-producers, to the extent that the latter is under contract with Love. Pl. Ex. 11, §§ 10 ¶ D, 19 ¶ A.

### C. Relationship Between Love and Watson

14. Entities that bring insurance business to brokers like Love, on the one hand, and premium insurance financing to outfits such as ASI, on the other, are commonly referred to as "producers," "retail brokers" or "retail insurance agents." Stipulation.

15. At all relevant times, Watson was such a producer, and had engaged in business with Love since March 31, 1987, referring business to Love (and, as a consequence, to the carriers that it represented) pursuant to a "Brokerage Agreement." Stipulation.

16. Watson was responsible for collecting the premiums for all policies and remitting the full premiums to Love for payment to the appropriate carrier. Pl.Ex. 31, ¶ B; Bingenheimer Depo. at 65. Through Love, the poli-

cies in question were forwarded by Canal or Fire & Casualty to Watson for delivery to Virginia insureds. Stipulation.

17. Love split the commissions that it received from Canal and Fire & Casualty in various percentages with Watson. Stipulation. Watson was paid these commissions by Love for placing business through it rather than through another general agent, and also for helping Love to fulfill its underwriting responsibilities, including taking the detailed information from insureds required by insurance companies for binding a policy. Bingenheimer Depo. at 63, 104–7.

18. Watson agreed "to hold [Love] and its representatives completely harmless from and to reimburse [Love] for any expense, loss or damage sustained by [Love] by any reason of any act or omission of [Watson] including, but not limited to, violations of or failures to comply with any of the provisions of this Agreement." Watson was also required to pay Love for all premiums, whether collected or not. Pl.Ex. 31, ¶¶ B, E(1).

19. All business transactions between Watson and Love were handled on an accounts current system. For each of the policies involved in the present controversy, the premium payment was recognized/entered as a debit in the Love monthly itemized statement provided to Watson. Love, in turn, credited Watson with commission and return premiums. Stipulation.

(a) For each of the relevant policies, the total premium owed by Love to Canal was recognized/entered as a debit, and Canal credited Love commission and return premiums.

(b) Similarly, for each of the relevant policies, the total premium owed by Love to Fire & Casualty was recognized/entered as a debit, and Fire & Casualty credited Love commission and return premiums.

20. Love provided to Watson, on a monthly basis, an itemized "Broker Statement" showing the total premiums, return premiums, down payment credits and commissions allowable. Watson was to pay Love the balance due under this credit and debit monthly accounting within 20 days from the date that such Broker Statement was rendered. Pl.Ex. 31, ¶ B(1)(b). The Broker Statements for the period in dispute are provided in Pl.Ex. 54.

21. Love Account No. 341, set up for accounts current billing to Watson from January 31, 1990, through November 30, 1992, contains the transactions related to the policies in dispute. Stipulation.

22. Love benefitted from the accounts current billing in two ways. First, Love relied on its retail agents to collect and account for premiums. Second, because its insurers did not require premium payments to be remitted to them for a period of time (for Canal, up to 45 days; for Fire & Casualty, up to 60 days), Love could retain any interest income earned during this time. This benefit is usually referred to as a "float." Pl.Ex. 11, 12; Bingenheimer Depo. at 198–200.

23. Love, by the use of the accounts current system, applied or set off return premiums from the cancellation of a particular policy to reduce Watson's total outstanding debt to Love. Watson, in turn, received the benefit of a float in that Love did not require that premium payments, either directly from insureds or from financed funds, be remitted to it for a period of up to 50 days, during which time Watson could earn interest income. Bingenheimer Depo. at 195–7; Patton Depo. at 35–37.

24. Monies received by Watson from insureds or premium finance companies were monies due the general agent or the insurance company and should have been earmarked as such by Watson. Stipulation.

25. Due to its Brokerage Agreement and accounts current system with Watson, Love was in a better position to monitor Watson's financial situation than was ASI or any insured. Testimony of W.E. Love. However, it would have been extremely difficult, if indeed possible, to trace funds passing between Watson and Love as related to any one particular policy. Stipulation.

26. On June 12, 1992, Love terminated its business relationship with Watson. Stipulation. The Watson accounts current with Love presently carries a credit balance that includes return of premiums, which Love has

not paid to the insureds or their assignees. Instead, Love has placed the funds in an escrow account with the Bureau. Patton Depo. at 41–45.

### D. Relationship Between ASI and Watson

27. ASI began its business relationship with Watson in July 28, 1988. Stipulation. Prior to this, ASI had Watson complete an "Agency Profile," a form used by ASI in deciding whether or not to establish a business relationship with a producer. Bittner Depo. at 32; Def. Ex. 3A, B, C.

28. ASI thereafter conducted an investigation of Watson, assessing such factors as Watson's credit-worthiness and that of the companies issuing policies through Watson, its business relationship with these insurance companies, and its length of time in and volume of business. Stipulation.

29. Watson disclosed on the Agency Profile that it operated on an accounts current system with the insurers listed thereon, with whom Watson did business. Watson also requested "sight draft authority" from ASI in connection with these insurers. Stipulation. Sight draft authority would permit Watson to write and sign ASI's blank sight drafts on behalf of ASI. Bittner Depo. at 46, 39–40.

30. ASI approved Watson's Agency Profile on October 16, 1988, and granted Watson sight draft authority sometime between that date and November 16, 1990. ASI only issues sight draft authority to certain producers with whom it does business. Stipulation.

31. Sight drafts were used by ASI and Watson for payment of financed premiums. By permitting Watson to make sight drafts payable to itself, ASI enabled Watson to bring these funds into Watson's account current system with other parties, including Love. Bittner Depo. at 46–47, 49.

32. ASI permitted Watson to name themselves as payee on sight drafts notwithstanding the fact that ASI's sight drafts instructed Watson to "[f]orward original draft to Insurance Company." Watson's practice, in fact, was to write and sign sight drafts on behalf of ASI, making them payable to itself. Bittner Depo. at 49; Def. Ex. 3.

33. Moreover, although ASI reserved the right to reject the sight draft after presentation to ASI's bank, ASI does not appear to have ever actually exercised this approval right. Bittner Depo. at 39, 53.

34. Other than ASI's approval rights on sight drafts, which it never exercised, there are no differences between an ASI sight draft and an ordinary ASI check. Bittner Depo. at 40. Under these circumstances, ASI's issuance of sight draft authority allowed Watson to extend credit to insureds on behalf of ASI.

35. ASI's sight draft authority benefitted Watson by facilitating the operation of its accounts current system with insurers and their general agents. Bittner Depo. at 44. In addition, the sight draft authority allowed Watson to retain custody of the premium finance funds for a period of time, all the while earning interest income. Bittner Depo., Ex. No. 3.

36. Watson could not have received the benefit of a float if ASI had required it to follow ASI's instruction to forward the original sight drafts to the insurance company. Bittner Depo., Ex. No. 3.

37. As for ASI, issuing sight draft authority to Watson helped it to remain competitive with other premium finance companies. Bittner Depo. at 43, 44. As early as July, 1988, ASI knew that Watson had already received sight draft authority from TIFCO, another premium insurance finance company. Def. Ex. 3A.

38. Once issued, ASI never modified Watson's sight draft authority in any form until it terminated their business relationship. Stipulation.

39. In addition to blank ASI premium finance contracts and ASI sight drafts, ASI provided Watson with its rate book. This enabled Watson to provide directly to insureds, ASI's rates and monthly figures.

The rate book assisted Watson in calculating finance charges, allowing it to avoid, in some instances, calling ASI for a quote on financing data. Bittner Depo. at 50, 51.

40. ASI also authorized Watson to accept monthly payments from insureds on its behalf. This authority was not withdrawn until January 17, 1992, when ASI sent Watson a letter, stating:

Due to the recent situations regarding your agency, please be advised that your agency can no longer accept any form of payment from your insureds for payment on their accounts.

Def. Ex. 41; see also Def. Ex. 31–33, 34–36.

41. ASI never paid a fee or a commission to Watson, nor vice-versa. Further, no accounts current arrangement existed between the two. However, producers such as Watson are ASI's exclusive source of business for the financing of insurance premiums. Bittner Depo. at 22.

42. ASI knew that it is commonplace for a producer to have an accounts current system with an insurance company or its general agent; and further, that this system involved recording debits and credits, and having the producer pay the net amount due from these entries to the insurer (or its general agent) on a monthly basis. Bittner Depo. at 35, 36. Thus, ASI understood that debits and credits involving different insureds would be set-off against one another.

43. On January 3, 1992, ASI terminated its business relationship with Watson. Def. Ex. 39A, B, C.

## III. FINANCING INSURANCE PREMIUMS

### A. ASI's Premium Finance Agreement Form

44. Through written premium service agreements,[1] also known as premium finance contracts, ASI financed insurance premiums on behalf of Virginia consumers for policies issued through Love by certain insurance carriers, including Canal and Fire & Casualty. Stipulation.

45. The ASI premium finance contracts at issue in the instant action are agreements between ASI, Watson and each individual insured. Thus, each contract contains, in addition to the terms of the premium service agreement between ASI and the insured, a separate and distinct "Producer's Certification." Pl.Ex. 49, 50, 51.

46. Under the premium service agreement, the insured expressly: (i) promises to make monthly installment payments to ASI in consideration for its financing the policy premium; (ii) assigns as security to ASI, the insured's contractual right to all unearned premiums under the policy; and (iii) appoints ASI as her attorney-in-fact, in the event of a default, to authorize the policy's cancellation and receive any unearned premiums financed under the premium service agreement. Pl. Ex. 49, 50, 51.

47. The Producer's Certification, on the other hand, is an acknowledgement by the carrier through its agents that: (i) the insurance policy being financed has been issued and is in force; (ii) notice has been given and received that the premium for the policy has been financed; and (iii) the finance company has a security interest in any unearned premiums. Pl.Ex. 49, 50, 51.

48. Watson signed the Producer's Certification for all of the policies subject to this litigation, as the agent of the authorized policy issuing agent of Canal and Fire & Casualty. On each of the policies at issue in this action, the financed premium was paid · by ASI on behalf of the insured by sight draft to the order of Watson and the certification provided as follows:

Upon cancellation of the policies financed, [Watson] will remit to Agency Services, Inc. of VA (ASI) the full amount of unearned premium, including unearned commission, applicable to such cancelled policies upon receipt from the carrier.

Pl.Ex. 49, 50, 51.

49. The course of dealing between Watson and ASI establishes that where Watson received premium returns from insurers through an accounts current system, Watson would deliver those return premiums to

---

1. A financing vehicle that permits an insured to make installment payments to a finance company in order to avoid having to pay all the cash upfront.

ASI.[2] Consistent with this course of dealing, and also in compliance with the premium finance contracts, Watson delivered return premiums to ASI. Bittner Depo. at 91–98.

50. In each instance cited in the footnote to the preceding paragraph, ASI sent out its standard notice of financing. In none did ASI complain to the Bureau of any irregularity or violation on the part of any company or individual (as required by Virginia State Insurance Regulation No. 6, § 7.2). Bittner Depo. at 101. ASI did not complain because ASI approved and consented to Watson's receipt of return premiums through an accounts current system for subsequent delivery by Watson to ASI.

51. And in the first instance, ASI sent Love a notice upon ASI's request for the cancellation of the Howard Hyde policy. That notice is identical to the notices of cancellation sent Love for the policies involved in this suit. Cf. Def. Ex. 18 with Pl.Ex. 52, 53.

52. Throughout the course of ASI's business relationship with Watson, ASI regularly sent Watson an "Account Analysis," advising Watson of the status of insured's accounts with ASI. The Account Analysis listed categories of events that ASI anticipated would occur from time to time, and had designations for "cancellation refunds" that were 60, 90 or 120 days past due. Def. Ex. 10, 11. The term "cancellation refund" is synonymous with return premium, and these entries advised Watson that ASI had not received from Watson certain return premiums for the stated period. Bittner Depo. at 82.

53. ASI also sent out notices of financing, to advise the applicable insurer and Love that:

(a) the insured had assigned all unearned premiums that may become payable under the policy to ASI;

(b) the applicable insurer and Love should notify ASI of any discrepancies in the notice of financing, including whether the policy was not in force not as described in the notice; and

(c) ASI should be notified if payment is not authorized to the agent appearing on the notice. Pl.Ex. 6.

## IV. WATSON'S DEFAULT

54. As noted earlier, under their contractual arrangement to use an accounts current system to facilitate their business transactions, Love and Watson agreed that Love would credit Watson's account with return premiums due insureds and/or finance companies, and Watson would return the premiums to them. Bingenheimer Depo. at 140–41; Pl.Ex. 31.

55. Love often contacted Watson to remind Watson of its obligation to deliver return premiums to the applicable premium finance companies, including ASI. Patton Depo. at 29–30. However, over a period of two years, Love had allowed Watson to consistently fall behind on its monthly payments on the accounts current. Pl.Ex. 54.

56. On or around September 1991, a Watson check written to satisfy its monthly account with Love was dishonored. Love then notified Watson that it expected strict compliance with the Brokerage Agreement and immediate payment of outstanding accounts. Patton Depo. at 63–64.

57. Again, at the end of October 1991, Watson's payment to Love on its account failed to clear the bank. Pl.Ex. 13. Love had difficulty collecting the payment.

58. Watson stopped paying on its account current with Love in late 1991. Bingenheimer Depo. at 227.

59. On January 2, 1992, Love stopped allowing Watson to place business with Love through the accounts current system. Pl.Ex. 34. After this date, the policies remaining on

---

2. The following instances illustrate this course of dealing:

| Insured's Name | Date of Check | Check No. | Amount | Def. Ex. |
| --- | --- | --- | --- | --- |
| Howard Hyde | 03/08/90 | 5066 | $ 909.50 | 16 |
| Charles Wallace | 05/14/91 | 1936 | 1,010.00 | 21 |
| Michael Mitter | 01/01/91 | 1425 | 354.00 | 23 |
| Jeffrey S. Blant | 04/25/91 | 1849 | 1,333.00 | 27 |
| Carl Whittaker | 05/30/91 | 1958 | 1,506.00 | 29 |

the accounts current that had been placed with Love by Watson were cancelled for nonpayment and the return premiums were credited to Watson's overdue account, thus reducing its outstanding balance with Love. This procedure was in accordance with the accounts current system, where specific funds are not returned to Watson to pay specific return premiums. Bingenheimer Depo. at 134–9.

60. ASI, in turn, sent Watson its regular Producer's Statement on December 10, 1991, noting that "the list of accounts below represent unpaid balances due from you" and then specified a number of return premiums, some of which are at issue in this case. The Statement also denoted the return premiums (except one) with an "R" code, indicating that the return premiums had been sent to Watson by the insurance carrier (or their general agent) and Watson should send those return premiums on to ASI. Def. Ex. 12. By this document, ASI was demanding that Watson do as it had promised to under the premium finance contract, that is, pay return premiums to ASI. Bittner Depo. at 87–89.

61. When ASI received no installment payments from the insureds on the policies at issue, ASI sent notices of cancellation to the applicable carriers and Love. Consequently, ASI discovered that Watson had made false representations because the policies had not issued as certified by Watson. The policies were subsequently cancelled, or endorsements added from which return premiums arose. Stipulation.

62. ASI has not received any refund from either the carriers, or Love or Watson for the aforementioned polices that were cancelled, even though it had already paid Watson $21,424 in financing for the purported premiums.

63. On December 10, 1991, ASI sent a Producer Statement to Watson demanding payment of six of the return premiums at issue in this case. Def. Ex. 12.

64. On December 12, 1991, ASI wrote Watson advising Watson that ASI was billing Watson for $56,757.00 in unpaid return premiums. ASI's demand letter to Watson noted that "the companies have advised us that they have credited your account current statement with these return premiums." Def. Ex. 39B.

65. ASI made no similar concurrent demand on any other individual, general agent or insurer. Testimony of W.E. Love.

66. On December 17, 1991, ASI dispatched Nancy Christman to Watson's offices to collect return premiums demanded by ASI. Watson issued a check to ASI in the amount of $25,122.60. Def.Ex. 37. This check represents an effort by Watson to pay ASI a portion of the demanded return premiums. Bittner Depo. at 104.

68. On December 20, 1991, ASI advised the Bureau of the status of ASI's collection efforts against Watson for overdue return premiums. Def. Ex. 38.

69. In late December, 1991, ASI learned that Watson's check in the amount of $25,-122.60 representing payment for return premiums had been dishonored. Stipulation.

70. On or about January 2, 1992, ASI, upon request from Watson, attempted to redeposit the aforementioned check and the check was again dishonored. Stipulation.

71. On January 3, 1992, ASI notified Watson that it was terminating their business relationship for the reason that Watson was delinquent in remitting return premiums and had issued a dishonored check as described above. Def. Ex. 39A; Pl.Ex. 19.

72. On January 6, 1992, ASI informed the Bureau that Watson was indebted to it for unpaid return premiums. No other indebtedness was alleged in that letter. Def. Ex. 20.

73. On January 17, 1992, ASI withdrew Watson's authority to receive payments from insureds on its behalf. Def. Ex. 41.

74. On January 28, 1992, ASI again wrote Watson, demanding payment of return premiums from which Watson had previously received credits. ASI also admitted in this letter that "our potential loss, as we see it now, regardless of what is (s)hown above, could be in excess of $150,000." Def. Ex. 42.

75. Prior to January 28, 1992, ASI had made no demand on any party other than Watson regarding the delinquent return premiums. On that day, ASI wrote Love, demanding a total sum of $109,808.00 in return premiums. Pl.Ex. 16.

76. On February 10, 1992, Denise Johnson, an employee of Love's, confirmed to ASI that for "return premiums issued 1/92 and subsequently, [Love] will issue return premium checks directly to ASI." Enclosed with the letter was Love's check for $22,120.00, in payment of gross return premiums issued in January or February, 1992. Pl.Ex. 17. This amount represented credits for return premiums that Love intended to send to Watson under the accounts current system but that Watson had not yet realized by an end-of-month financial reconciliation. Testimony of Don Brooks.

77. Love made no further payments to ASI for gross return premiums after February 10, 1992. The remaining amount of gross unearned or return premiums arising *after* January 1992 totals $52,720.00. Of that amount, $25,427.00 is due ASI on policies issued by Canal; and $22,724.00 is due ASI on policies issued by Fire & Casualty. Stipulation.

78. However, the unearned premiums total $72,273.00 for the policies issued by Canal and $58,616.00 for those issued by Fire Casualty.

79. On June 16, 1992, ASI made a demand on Fire & Casualty for $61,505.33 for return premiums due ASI on policies issued by the latter. In response, on July 8, 1992, Lois A. Huot, legal counsel for Fire & Casualty, admitted that it was responsible for the unearned premiums demanded by ASI and was required by law to return these funds to ASI. Pl.Ex. 1.

80. Love objected to Fire & Casualty's position as set forth in the July 8, 1992 letter, and requested a retraction since its position was that any financed premiums recorded through the accounts current system had to be credited back through that system. Bingenheimer Depo. at 259–63.

81. ASI has not received any of the aforementioned unearned premiums because Love credited Watson's Account (No. 341) by the amount of the unearned premiums for each of the policies at issue. Canal, in turn, credited Love's accounts current system by the amount of the unearned premium, as did

Fire & Casualty to Love's account current. ASI was thus left "holding the bag."

82. The Court finds that ASI consented and contractually authorized Watson to accept return premiums on ASI's behalf.

83. ASI further consented and contractually authorized Watson to accept return premiums on ASI's behalf through Watson's accounts current with various insurers and general agents, including Love, Canal and Fire & Casualty.

84. ASI's consent and authorization in this regard established Watson as ASI's agent for the purpose of receiving return premiums on ASI's behalf.

85. The Court further finds that ASI's letter to Love on January 28, 1992, did not rise to the level of a clear, actual notice of ASI's termination of Watson's agency, previously established by ASI's consent, contractual authorization and longstanding custom and practice.

## CONCLUSIONS OF LAW

1. It is virtually undisputed, under the terms of the policies issued by Canal and Fire & Casualty through Love and Watson, for which ASI financed premiums, that the insured was entitled to unearned premiums from the applicable insurer upon cancellation of the policy or the addition of certain endorsements. *See Credit Alliance Corp. v. Sturdevant–Van Wormer Ins.*, 465 F.Supp. 1115 (D.Mont.1979) (the "law is settled that, upon the cancellation of insurance under a policy which provides for refunds in the event of cancellation, the insurer owes the insured.")

2. It is also clear that the applicable premium finance agreements contain enforceable assignments by the insureds to ASI of the insureds' rights under the issued policies to any and all return premiums. *See Lataif v. Commercial Indus. Constr.*, 223 Va. 59, 62–3, 286 S.E.2d 159 (1982) (an actionable assignment shows a clear intent to transfer an identified chose in action).

3. Additionally, Virginia State Insurance Regulation No. 6, Section 4.6, of the State Corporation Commission's Rules Governing

Insurance Premium Finance Companies (the "State Insurance Rules"), which all three defendants in this action are subject to, mandates, in situations where financing is provided by a premium finance company:

Upon any cancellation whenever the insurer has received notice that the return premium has been assigned to a licensee, the insurer shall return any gross unearned premium to the licensee within 60 days after the effective date of cancellation.

Ins.Reg. No. 6, § 4.6.

4. As the insureds' assignee, ASI stands in the shoes of the insureds. *Brooks v. United States,* 833 F.2d 1136 (4th Cir.1987) (it is well-established that the assignee steps into the shoes of the assignor, subject to all prior equities between previous parties). *See also Sheeran v. Sitren,* 168 N.J.Super. 402, 403 A.2d 53, 61 (1979) (unearned premiums issued by carrier ultimately belong to insureds, "or those who stand in their shoes, such as financing companies.")

5. Thus, ASI (the "licensee" in the paragraph 3 above), as the assignee of the insureds, is entitled to the return premiums at issue. The dispute then turns on whether the accounts current system in place between the relevant parties constituted an effective "return" of the unearned premiums to ASI, and whether the off-setting involved in that system contravened the State Insurance Rules, which also provides that "[n]o insurer or agent shall apply any return premium due as a result of a cancellation of a particular policy to any outstanding balance on another policy of the insured." Ins.Reg. No. 6, § 4.6. The Court answers in the affirmative to the first question, and in the negative to the second.

■ 6. Insureds, or their assignees, can appoint agents to receive return premiums on their behalf. Ann.Code of Va., § 38.2–1813; Ins.Reg. No. 6, § 7.1. The applicable Virginia statutes and regulations allowed ASI, by consent or authorization, to designate Watson as its agent for the receipt of unearned premiums owed to ASI by Love, Canal and/or Fire & Casualty. *See id.*

■ 7. Watson's status as ASI's special agent is a question of fact. *Pacific Fire Ins.*

*Co. v. Bowers,* 163 Va. 349, 175 S.E. 763 (1934); *Middle Western Telephone Co. v. United States Fire Ins. Co. of New York,* 296 Ill.App. 260, 16 N.E.2d 188 (1938) (broker acted as agent for the insured for the purpose of collecting unearned premiums).

■ 8. Virginia Statute 38.2–1801 is contrary to common law principles of agency which hold that agency relationships are questions of fact. As such, the Court presumes no change in the common law beyond that which is expressly stated. *See Bowers,* 163 Va. 349, 175 S.E. 763 (1934); *Boyd v. Commonwealth of Virginia,* 236 Va. 346, 374 S.E.2d 301 (1988).

9. In addition, the maxim that the mention of one thing or class of persons in a statute implies the exclusion of another is especially applicable in the construction and interpretation of statutes. *See Tate v. Ogg,* 170 Va. 95, 195 S.E. 496 (1938); *Layne v. Hayes,* 141 W.Va. 289, 90 S.E.2d 270 (1955). Virginia Statute § 38.2–1801 identifies the insured and the insured's beneficiary as subjects of this statute. A narrow construction of this statute therefore renders the statute inapplicable in the instant case because the controversy in this case is not between an insurer or his beneficiary and an insured's company, but rather, between a corporate assignee of an insured and an insured (and the latter's general agent).

■ 10. The Court holds that by the accepted and long-standing course of conduct between the parties, as well as by authorization, ASI consented to Watson receiving unearned premiums on its behalf. Furthermore, ASI's consent remained effective despite any language to the contrary in ASI's premium finance agreements, notices of financing, notices of cancellation or sight drafts. *See* Ins.Reg. No. 6, § 7.1.

■ 11. Additionally, ASI is estopped from denying that the return of unearned premiums to Watson, through an accounts current, constituted an effective remittance to ASI. Estoppel arises because ASI engaged in a lengthy course of conduct where ASI accepted unearned premiums from Watson rather than Love, Canal or Fire & Casu-

alty. *Stebbins & Lawson v. Bruce*, 80 Va. 389 (1885).

 12. The Court also concludes that ASI waived any claim for unearned premiums by its agreement with Watson, pursuant to ASI's premium finance contracts, for Watson to receive return premiums on its behalf. Any ambiguities in the contracts have been construed against ASI, the party who drafted them.

13. Additionally, Watson's status as ASI's agent for purposes of receiving unearned premiums is not affected by any agency relationship, actual or apparent, that Watson may have had for other purposes with Love, Canal and/or Fire & Casualty. *See James v. Anderson*, 149 Va. 113, 140 S.E. 264 (1927) (dual agency permitted insofar as there is consent by the principals.)

14. Once ASI established an agency relationship with Watson for the limited purposes of receiving unearned premiums on ASI's behalf, ASI could only terminate that agency by issuing a clear, actual notice of such termination. *Morton Marks & Sons v. Hill–Chase Co.*, 196 Va. 268, 83 S.E.2d 356 (1954). The Court finds that this was not done by ASI.

15. Further, the State Insurance Rules does not prohibit the return of unearned premiums to ASI through its special agent, Watson, via an accounts current system that existed between Watson and Love, insofar as it merely prohibits insurers or their agent from "apply[ing] any return premium due as a result of a cancellation of a particular policy to any outstanding balance on another policy *of the insured.*" Ins.Reg. No. 6, § 4.6 (emphasis added). That regulation is clearly intended for the protection of individual insureds, and not corporate assignees.

16. And the Court holds that ASI waived the common law requirement of mutuality of debt for set-offs in that ASI knew that an accounts current system, involving certain set-offs, was utilized by Watson and Love for purposes of returning unearned premiums by ASI's agent to Watson, ASI's agent for this purpose. Rest. of Agency, § 299, Comment a. *C.T. Fuller v. Fasig–Tipton Co., Inc.*, 587 F.2d 103 (2d Cir.1978).

17. Upon reviewing all of the evidence in this case, the Court concludes that the accounts current system in place between Watson and Love, on the one hand, and Love and Canal or Fire & Casualty, on the other, did not violate Regulation 6 of the State Insurance Rules, insofar as no individual insureds were involved. The Court also concludes that ASI consented to Watson's receipt of unearned premiums on its behalf. Thus, the credit to Watson's account pursuant to the accounts current system constituted an effective return said premiums to ASI. The Court therefore renders judgment on behalf of the defendants in this action.